U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED

APR 0 6 2015

CHRIS R. JOHNSON, CLERK
BY

DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

UNITED STATES OF AMERICA and
STATE OF ARKANSAS,                    )
                                      )
                                      )
          Plaintiffs,                 )
                                      )
v.                                    )   CIVIL ACTION NO.
                                      )   2:14-CV-2266-PKH
CITY OF FORT SMITH, ARKANSAS,         )
                                      )
          Defendant.                  )
                                      )

**CONSENT DECREE**

# TABLE OF CONTENTS

**Sections and Articles**                                                **Page(s)**

I.     JURISDICTION AND VENUE ................................................................ 4

II.    OBJECTIVES ........................................................................................ 5

III.   APPLICABILITY ................................................................................... 5

IV.    DEFINITIONS ....................................................................................... 6

V.     COMPREHENSIVE REMEDIAL REQUIREMENTS ................................. 16

       A.   Introduction .................................................................................. 16

       B.   Article One:  Sewer System Condition Assessments ........................... 17

       C.   Article Two:  Condition Remedial Measures ..................................... 21

       D.   Article Three: Pump Station/Force Main Evaluation Report .............. 23

       E.   Article Four:  Capacity Assessment and Hydraulic Modeling ............ 27

       F.   Article Five:  Capacity Remedial Measures Plan ............................... 31

       G.   Article Six:  Capacity-Related Remedial Measures Projects Identified in
            Appendices E1 and E2. ................................................................... 33

       H.   Article Seven:  Development of a Capacity, Management Operation and
            Maintenance Program ..................................................................... 34

            Introduction ................................................................................. 34

            WCTS Maintenance Activities Until Full CMOM Implementation .......... 34

            FOG Control Program Component ..................................................... 34

            FOG Program Reporting .................................................................. 37

            Root Control Program Component ..................................................... 38

            Root Control Program Reporting ...................................................... 38

            Gravity Sewer Line Cleaning Component ............................................ 38

            Cleaning Program Reporting ............................................................ 41

            Continuing Sewer System Assessment Program Component .................. 41

ii

Continuing Pump Station and Force Main Evaluation and Maintenance Program .................................................................................. 42

Continuing Capacity Assurance Program ............................................................. 45

SSO Reporting Component .................................................................................... 47

SSO Emergency Response Program Component ................................................... 48

OERP Reporting .................................................................................................... 50

Information Management System .......................................................................... 50

Standard Operating Procedures Component .......................................................... 51

Private Service Line Defect Remediation Program Component .......................... 53

Comprehensive Training Program Component ..................................................... 54

Inventory Management Component ....................................................................... 55

I.    Article Eight: Assessment and Remediation Plan for Effluent Limit Exceedances at the Massard WWTP and P Street WWTP ................................... 56

J.    Article Nine: Schedule Reconsideration Based on Financial Circumstances ...... 58

VI.    MITIGATION PROGRAM REQUIREMENT ................................................................ 62

VII.    CIVIL PENALTIES ........................................................................................................ 65

VIII.    SUPPLEMENTAL ENVIRONMENTAL PROJECT ...................................................... 66

IX.    DELIVERABLES AND REVIEW PROCESS ................................................................ 69

X.    REPORTING .................................................................................................................... 73

XI.    CERTIFICATION, APPROVAL, AND SEAL BY A PROFESSIONAL ENGINEER .. 87

XII.    STIPULATED PENALTIES ............................................................................................ 88

XIII.    FORCE MAJEURE ......................................................................................................... 95

XIV.    DISPUTE RESOLUTION ............................................................................................... 97

XV.    INFORMATION COLLECTION AND RETENTION ................................................... 99

XVI.    FAILURE OF COMPLIANCE ...................................................................................... 101

XVII.    CERTIFICATION ......................................................................................................... 102

XVIII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS ...................................... 102

XIX.    COSTS ........................................................................................................................... 104

XX.      NOTICES ................................................................................................. 104

XXI.     EFFECTIVE DATE ................................................................................. 106

XXII.    RETENTION OF JURISDICTION ..................................................... 106

XXIII.   MODIFICATION ................................................................................... 106

XXIV.    TERMINATION ..................................................................................... 107

XXV.     CONTINGENT LIABILITY OF THE STATE OF ARKANSAS .............. 108

XXVI.    PUBLIC PARTICIPATION ................................................................... 108

XXVII.   SIGNATORIES/SERVICE .................................................................... 109

XXVIII.  INTEGRATION/APPENDICES ........................................................... 109

XXIX.    FINAL JUDGMENT .............................................................................. 111

WHEREAS the City of Fort Smith, Arkansas ("City") owns and operates a Publicly

Owned Treatment Works ("POTW") as defined at 40 C.F.R. § 403.3 that includes two

Wastewater Treatment Plants ("WWTPs") and two Wastewater Collection and Transmission

Systems ("WCTS") collectively serving the WWTPs;

WHEREAS the State of Arkansas is a party to this action pursuant to Section 309(e) of

the Clean Water Act ("CWA"), 33 U.S.C. § 1319(e);

WHEREAS City discharges pollutants into navigable waters of the United States and

Waters of the State of Arkansas from the P Street WWTP (located at 13 North P Street in Fort

Smith), and the Massard WWTP (located in Fort Smith with a mailing address of 1609 North 9th

Terrace, Barling, Arkansas), pursuant to National Pollutant Discharge Elimination System

("NPDES") Permit No. AR0033278 ("the P Street Permit"), effective March 1, 2012, and

NPDES Permit No. AR0021750 ("the Massard Permit"), effective February 1, 2009;

WHEREAS Plaintiff, United States of America, by the authority of the Attorney General

of the United States and through its undersigned counsel, acting at the request and on behalf of

the Administrator of the United States Environmental Protection Agency ("EPA") and pursuant

to Section 309(a) of the CWA, 33 U.S.C. § 1319(a), and the Co-Plaintiff State of Arkansas,

acting at the request and on behalf of the Arkansas Department of Environmental Quality

("ADEQ"), by the authority of the Attorney General, pursuant to Ark. Code Ann. § 25-16-702(e)

and in accordance with CWA Section 309(e), 33 U.S.C. § 1319(e), and through its undersigned

counsel, jointly filed a Complaint against City seeking injunctive relief and a civil penalty;

1

WHEREAS Plaintiffs allege in their Complaint that: (1) City has violated and continues to violate Section 301 of the CWA, 33 U.S.C. § 1311, by discharging untreated sewage in the form of Sanitary Sewer Overflows ("SSOs") from its WCTS to waters of the United States and Waters of the State; (2) City has violated and continues to violate CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342 (hereinafter "CWA Sections 301 and 402"), and the condition in its NPDES permits requiring that it properly operate and maintain its WCTS; (3) City has violated and continues to violate the CWA Sections 301 and 402, and the condition in its NPDES permits ("Duty to Mitigate") requiring that it take all reasonable steps to minimize or prevent any discharge; (4) City has violated CWA Sections 301 and 402 and certain effluent limits set for the outfalls at its two WWTPs, contained in its NPDES permits; (5) City has violated the CWA Sections 301 and 402, and the condition in its NPDES permits requiring that it report to ADEQ the occurrence of all SSOs, and provide certain information regarding such SSOs; and (6) City has violated and continues to violate the CWA Sections 301 and 402 and the condition in its NPDES permits requiring that it maintain adequate back up power sources to prevent the discharge of untreated or inadequately treated wastes during electrical power failures;

WHEREAS, although City was then engaged in implementing its Wastewater Management Plan (September, 1993) to address unpermitted discharges from its POTW, on January 21, 1999, EPA issued to City Administrative Order Docket No. CWA-VI-99-1204 and No. CWA-VI-99-1205, which required City to take appropriate measures to comply with the CWA and its NPDES Permits to eliminate unpermitted discharges from its WCTS;

2

WHEREAS, as continued implementation of its Wastewater Management Plan, the City asserts that it has entered into contracts and expended over $203,463,010 on the design and construction of POTW improvements including upgrading of both WWTPs; development and continued maintenance of a WCTS hydraulic model; completion of WCTS evaluation studies on certain collector sewers; replacement or rehabilitation of certain collector sewers; construction of certain interceptor sewers; construction of the Sunnymede wet weather pump station and equalization ("EQ") storage facility; current construction of the Zero Street wet weather pump station and EQ storage facility; and completion of construction of the Mill Creek wet weather pump station and EQ facility, resulting in what the City believes is a significant reduction of SSOs in its WCTS;

WHEREAS, Fort Smith's POTW is a separate sanitary sewer system and the Parties nevertheless agree to utilize EPA's "Combined Sewer Overflows Guidance for Financial Capability Assessment and Schedule Development," EPA 8320B-97-004, published February, 1997 herein;

WHEREAS, notwithstanding City's development and continued implementation of its Wastewater Management Plan, EPA alleges that City has not made sufficient progress and remains in noncompliance with its NPDES Permits and the CWA, particularly in the area of SSOs;

WHEREAS City does not admit any liability arising out of the transactions or occurrences alleged in the Plaintiffs' Complaint and alleges that: (1) City's operation of its POTW in fact was consistent with the then current NPDES Permits issued by the State; (2) City

3

notified EPA and the State that its Wastewater Management Plan and its implementation were consistent with principles of affordability; and (3) EPA did not notify City not to implement the Wastewater Management Plan and submittals by the City pursuant to the Plan; and

WHEREAS the Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid prolonged and complicated litigation among the Parties, and that this Consent Decree is fair, reasonable, and in the public interest.

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, below, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 28 U.S.C. §§1331, 1345, 1367(a) and 1355, and Sections 309(b) of the CWA, 33 U.S.C. § 1319(b), and over the Parties.  Venue lies in this District pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391 (b) and 1395(a), because City is located in this judicial district, and the violations alleged in the Complaint are alleged to have occurred in this judicial district. For purposes of this Decree, City does not contest the Court's jurisdiction over this action or over the City, and does not contest venue in this judicial district.

2.    For purposes of this Consent Decree, City agrees that Plaintiffs' Complaint states claims upon which relief may be granted pursuant to Sections 301 and 309 of the CWA, 33 U.S.C. §§ 1311 and 1319.

4

## II.    OBJECTIVES

3.    This Consent Decree shall have the objective of causing Fort Smith to achieve and
maintain full compliance with the Decree, the CWA, the regulations promulgated under the
CWA, and City's NPDES Permits, including the goal of eliminating all SSOs.

## III.    APPLICABILITY

4.    The obligations of this Consent Decree apply to and are binding upon the United States,
the State of Arkansas, and upon City, its agents, successors, assigns and other entities or
persons otherwise bound by law.

5.    At least thirty (30) days prior to transferring ownership or operation of either the
P Street WWTP or the Massard WWTP, or any part of, or the whole WCTS to any other person,
City shall provide a copy of this Consent Decree to each prospective successor owner or operator
and shall simultaneously verify such by a written notice to EPA Region VI, the United States
Attorney for the Western District of Arkansas, the United States Department of Justice and the
ADEQ (on behalf of the State of Arkansas in accordance with Section XX of this Decree
("Notices"). Any such transfer must be conditioned upon the transferee's agreement to
undertake the obligations required by this Decree, and no such transfer shall relieve City of its
obligation to ensure that the terms of the Decree are implemented.

6.    Until this Consent Decree is terminated pursuant to Section XXIV, City shall post a copy
of this Decree on City's website. City shall provide a copy of this Consent Decree, or otherwise
make it available by providing notice of location of posting, to each City official and City
employee whose duties may reasonably include compliance with any provision of this Decree

5

and to each engineer, Consultant and Contractor already retained (and to be retained in the future) to perform any activities required by this Consent Decree upon the execution of any contract relating to such activities.

7.       In any action to enforce this Consent Decree, City shall not raise as a defense the failure by any of its officials, employees, agents, Consultants or Contractors to take any actions necessary to comply with the provisions of this Consent Decree.

## IV.       DEFINITIONS

8.       Unless otherwise defined herein, terms used in this Consent Decree shall have the meanings given to those terms in the CWA and the regulations promulgated thereunder.  The following terms used in this Consent Decree shall be defined as follows:

  a.   "ADEQ" shall mean the Arkansas Department of Environmental Quality, and any successor departments or agencies of the State of Arkansas;

  b.   "Annual Report" shall mean the report to be submitted annually pursuant to Section X of the Consent Decree;

  c.   **"Appendix"** shall mean an attachment to this Consent Decree which contains details of compliance actions to be undertaken pursuant to this Decree;

  d.   "Article" shall mean a portion of Section V ("Comprehensive Remedial Requirements" Section) of this Consent Decree;

  e.   "Basin" shall mean a section of a Sewershed that is a distinct wastewater collection area, and designated by Fort Smith as such;

  f.   "Building/Private Property Backup" shall mean a wastewater backup into a building

6

and/or a wastewater overflow onto private property that is caused by blockages, flow conditions or other malfunctions in the WCTS. "Building/Private Property Backup" does not include a wastewater backup into a building and/or a wastewater overflow onto private property that is caused solely by a blockage or other malfunction of a Private Service Lateral or other piping or conveyance system that Fort Smith does not own or operate;

g.  "Calendar Year" shall mean the 12-month period starting on January 1 and ending on December 31 of a given year;

h.  "Capacity Constraint" shall mean those discrete components, or groups of components of the WCTS that are determined by the City, consistent with Section V, Article Four ("Capacity Assessment and Hydraulic Modeling") of this Consent Decree to have capacity deficiency issues that have caused or significantly contributed to previous capacity-related SSOs; that are likely to cause or significantly contribute to future capacity-related SSOs; and/or that are identified as overflow locations for any storm event presented in Section V, Article Four, Paragraph 30;

i.  "City" or "Fort Smith" shall mean the City of Fort Smith, Arkansas;

j.  "Clean Water Act" or "CWA" shall mean the federal Clean Water Act found at 33 U.S.C. §§ 1251- 1387;

k.  "CMOM" or "Capacity, Management, Operations, and Maintenance" shall mean a program of accepted industry practices to properly manage, operate and maintain sanitary sewer collection, transmission and treatment systems, investigate capacity-

7

constrained areas of these systems, and respond to SSO events, including as identified by the Guide for Evaluating Capacity, Management, Operation, and Maintenance (CMOM) Programs (EPA, Jan. 2005);

l.  "Complaint" shall mean the complaint filed by the United States and the State of Arkansas in this action;

m. "Consent Decree" or "Decree" shall mean this Decree and all Appendices attached hereto and listed in Section XXVIII;

n.  "Consultant" shall mean a professional engineer licensed in the State of Arkansas or other recognized professional within a field of practice, with appropriate qualifications, experience and adequate staff and resources necessary to undertake any program plan, study, analysis, design or report required by the terms of this Consent Decree;

o.  "Contractor" shall mean a person or entity who in pursuit of its business undertakes to perform a job or piece of work, retaining in himself control of means, method and manner of accomplishing the desired result;

p.  "Critical Response Time" shall mean the time interval between activation of the high wet well level alarm at a Pump Station and the first SSO from the WCTS tributary to that Pump Station under peak dry-weather flow conditions or under peak wet-weather flow conditions (generated by the analysis rainfalls presented in Section V, Article Four ("Capacity Assessment and Hydraulic Modeling") of this Consent Decree), whichever weather conditions prevail at the time of the SSO;

8

q. "Cross-Connection" shall mean any constructed connection, whether by pipe or any other means, between any part of the WCTS and any part of a storm water drainage system that is capable of conveying flow between the two systems;

r. "Date of Entry" shall mean the actual date the federal district court judge signs and approves this Consent Decree, after the public comment period expires, and after the United States files a motion for entry and a memorandum in support thereof;

s. "Date of Lodging" shall mean the date the United States files a copy of this Consent Decree signed by all Parties with the District Court, along with the Complaint, prior to submitting the Consent Decree for publication in the Federal Register to provide an opportunity for public review and comment thereon;

t. "Day" or "Days" shall mean a calendar day or calendar days unless expressly stated to be a business day or business days. In computing any period of time under this Consent Decree, where the last Day would fall on a Saturday, Sunday, or a federal or State holiday, the period shall run until the close of the next business day;

u. "Defendant" shall mean the City of Fort Smith, Arkansas;

v. "Deliverable" shall mean any written document required to be prepared and/or submitted by or on behalf of Fort Smith pursuant to this Consent Decree;

w. "Direct Discharge" shall mean a sewer pipe installed to convey wastewater from a sanitary sewer for release into the environment;

x. "EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States;

9

y. "Equalization Facilities" or "EQ Facilities" shall mean those components of the WCTS designated, designed or intended for the temporary storage of wet-weather wastewater flows;

z. "FOG" shall mean fats, oil and grease, whether petroleum-based, mineral-oil-based, animal-based or vegetable-based;

aa. "FOG Control Device" shall mean any grease interceptor, grease trap, or other mechanism, device, or process that attaches to or is applied to wastewater plumbing fixtures and/or Private Service Lines to collect, contain, or remove FOG from the wastewater stream of a FOG Generator prior to discharge into the WCTS;

bb. "FOG Control Program" or "Fats, Oil and Grease Control Program" shall mean Fort Smith's program to control discharge of FOG into the WCTS as developed and approved under Section V, Article Seven, Paragraph 37 of this Consent Decree;

cc. "FOG Generator" shall mean any food service establishment or food-processing establishment that discharges FOG into the WCTS, provided, however, that those establishments covered by the City's industrial user program shall not be considered a FOG Generator for the purposes of this Consent Decree;

dd. "Force Main" shall mean any pipe that receives and conveys, under pressure, wastewater from the discharge side of a pump. A Force Main is intended to convey wastewater under pressure;

ee. "Gravity Sewer Line" shall mean a pipe that receives, contains and conveys wastewater not normally under pressure, but intended to flow unassisted under the

influence of gravity. "Small Diameter Gravity Sewer Lines" shall mean Gravity Sewer Lines that are less than twenty-four (24) inches in diameter. "Large Diameter Gravity Sewer Lines" shall mean Gravity Sewer Lines that are twenty-four (24) inches or greater in diameter;

ff. "Infiltration" as defined by 40 C.F.R. § 35.2005(b)(20) shall mean water other than wastewater that enters a WCTS (including sewer service connections and foundation drains) from the ground through such means as defective pipes, pipe joints, connections, or manholes;

gg. "Inflow" as defined by 40 C.F.R. § 35.2005(b)(21) shall mean water other than wastewater that enters a WCTS (including sewer service connections) from sources such as, but not limited to, roof leaders, cellar drains, yard drains, area drains, drains from springs and swampy areas, manhole covers, cross connections between storm sewers and sanitary sewers, catch basins, cooling towers, storm water, surface runoff, street wash waters, or drainage;

hh. "I&I" shall mean the total quantity of water from Infiltration and Inflow without distinguishing the source;

ii. "Interest" shall mean interest accruing on a sum calculated in the manner provided by 28 U.S.C. § 1961;

jj. "MACP" shall mean the NASSCO Manhole Assessment and Certification Program;

kk. "Massard Permit" shall mean NPDES permit number AR0021750 issued to City pursuant to Section 402 of the Clean Water Act, 33 U.S. § 1342, and the Arkansas

11

Water and Air Pollution Control Act, Ark. Code Ann. § 8-4-10, *et seq.*, for the Massard POTW and any future extended, modified or reissued permit;

ll. "Massard WWTP" shall mean the publicly owned treatment works that is owned and operated by City and that is located in Fort Smith with an address of 1609 North 9th Terrace, Barling, Arkansas;

mm. "MGD" or "mgd" shall mean million gallons per day;

nn. "Month" shall mean one calendar month running from a numbered day to the same numbered day of the following calendar month, regardless of whether the particular month has 28, 29, 30 or 31 days.  If a triggering event would occur on a day of the month that does not exist (for example, February 30), then the event shall be due on the first day of the following month (for example March 1);

oo. "NASSCO" shall mean the National Association of Sewer Service Companies;

pp. "P Street Permit" shall mean NPDES permit number AR0033278 issued to City pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342, and the Arkansas Water and Air Pollution Control Act, Ark. Code Ann. § 8-4-10, *et seq.*, for the P Street POTW and any future, extended, modified or reissued permit;

qq. "P Street WWTP" shall mean the publicly owned treatment works that is owned and operated by City and that is located at 13 North P Street in Fort Smith, Arkansas;

rr. "PACP" shall mean the NASSCO Pipe Assessment and Certification Program;

ss. "Paragraph" shall mean a portion of this Decree identified by an Arabic numeral or a letter;

12

tt. "Parties" shall mean the City, the United States, and the State of Arkansas;

uu. "Pipe Segment" shall mean the portion of a Gravity Sewer Line extending from manhole to manhole;

vv. "Plaintiffs" shall mean the United States and the State of Arkansas;

ww. "Private Service Line" shall mean a sewer line which is not owned or operated by City, but which conveys wastewater from a building to a main line of the WCTS;

xx. "Private Service Line Release" shall mean any spill, release, or diversion of sewage from a Private Service Line to any location other than the WCTS caused solely by a blockage or other malfunction in that Service Line, even if the release does not reach Waters of the State or waters of the United States;

yy. "Pump Station" or "Pumping Station" shall mean facilities owned or operated by Fort Smith that contain pumps that lift wastewater from a lower to a higher hydraulic elevation, including all related electrical, mechanical, and structural systems necessary to the operation of that Pump Station within the WCTS;

zz. "Recurring Private Service Line Release" shall mean a Private Service Line Release that has occurred within three (3) Years of a prior Private Service Line Release at the same location;

aaa. "Recurring SSO," "Recurring Dry-Weather SSO," and "Recurring Wet-Weather SSO." A "Recurring SSO" shall mean any SSO that has occurred within three (3) Years of a prior SSO that occurred at the same location under any weather conditions (wet or dry). A "Recurring Dry-Weather SSO" shall mean an SSO that has occurred

13

during dry weather within three (3) Years of a prior SSO at the same location that also occurred during dry weather. A "Recurring Wet-Weather SSO" shall mean an SSO that has occurred during wet weather within three (3) Years of a prior SSO at the same location that also occurred during wet weather;

bbb. "Remedial Measures" shall mean spot repairs, trenchless sewer rehabilitation, sewer replacement, repair or reconstruction, and any other appropriate WCTS improvement technique for resolving condition deficiencies and/or capacity deficiencies in a particular system asset or group of assets within the WCTS, in accordance with **Appendix D** ("Remedial Determination Process"), that have caused or significantly contributed to previous SSOs, and/or, that are likely to cause or significantly contribute to future occurrence of SSOs;

ccc. "Sanitary Sewer Overflow" or "SSO" shall mean any spill, release, or diversion of sewage from the WCTS, including: (1) an overflow that results in a discharge to Waters of the State or waters of the United States, and (2) an overflow of wastewater, including a wastewater backup into a building or wastewater overflow onto private property, such as a Building/Private Property Backup (other than a backup caused solely by a blockage or other malfunction in a privately owned sewer or building lateral (*i.e.* a "Private Service Line")), even if that overflow does not reach Waters of the State or waters of the United States;

ddd. "Section" shall mean a portion of this Decree identified by a roman numeral;

eee. "Sewershed" shall mean a section of City's WCTS that is a distinct drainage or

14

wastewater collection area and designated as such by City for the P Street WWTP and the Massard WWTP;

fff. "State of Arkansas" or "State" shall mean the State of Arkansas acting on behalf of ADEQ;

ggg. "Sub-basin" shall mean a section of a Basin that is a distinct wastewater collection area and designated by Fort Smith as such;

hhh. "Subparagraph" shall mean a portion of this Consent Decree identified by a lower case letter followed by a period;

iii. "Tabulation" shall mean a document in a format containing text searchable cells or fields that is also sortable by data category;

jjj. "United States" shall mean the United States of America, acting on behalf of EPA;

kkk. "Wastewater Treatment Plant" or "WWTP" shall mean the Massard or P Street wastewater treatment plants and components thereof;

lll. "Wastewater Collection and Transmission System" or "WCTS" shall mean the sanitary sewer collection, retention and transmission systems for both the Massard WWTP Sewershed and the P Street WWTP Sewershed, including all pipes, Force Mains, Gravity Sewer Lines, Pump Stations, EQ Basins, manholes and appurtenances thereto, that are owned or operated by City at any time from the Date of Lodging of this Consent Decree until its termination under Section XXIV;

mmm."Waters of the State" shall mean all streams, lakes, marshes, ponds, watercourses, waterways, wells, springs, irrigation systems, drainage systems, and all other bodies

15

of accumulations of water, surface and underground, natural and artificial, public or private, which are contained within, flow through, or border upon the State of Arkansas, or any portion of the State of Arkansas, as defined in Ark. Code Ann. §8-4-102(10); and

nnn.  "Year" shall mean a twelve month period regardless of the beginning date.  In the event a triggered event shall be due on a year ending date that does not exist (for example, February 29 in some years), then the event shall be due on the first day of the following month (for example, March 1).


## V.    COMPREHENSIVE REMEDIAL REQUIREMENTS

### A.    Introduction

9.    The following nine Articles constitute the actions that City shall undertake or continue to undertake to achieve the Objectives of this Consent Decree, as stated in Section II.  City shall implement all ongoing WCTS investigations, analyses, and Remedial Measures consistent with sound engineering practices, City's best professional judgment, industry standards, and the guidance manuals identified in this Section of the Consent Decree.  Subject to the provisions of this Consent Decree, all actions required under Section V of this Consent Decree shall be completed no later than twelve (12) years after the Date of Lodging, except those ongoing actions identified under Section V, Article Seven ("Development of a Capacity, Management, Operation and Maintenance Program") that shall continue after termination of this Decree, under Section XXIV of this Consent Decree.

**B.    Article One: Sewer System Condition Assessments**

10.    City shall conduct Sewer System Assessments ("SSAs") for the Gravity Sewer Lines and

manholes in the WCTS, as presented in the last column of **Appendix C** ("SSA Status").  The

SSA activities shall identify structural defects and any other non-structural defects in the WCTS

that have caused or significantly contribute to previous SSOs and/or that are likely to cause or

significantly contribute to the future occurrence of SSOs.  The SSAs on the Gravity Sewer Lines

and manholes set forth in **Appendix C** shall be completed no later than eight (8) years from the

Date of Lodging.

    a.  By the following dates, City shall have completed SSA activities on the following

        minimum number of unique miles of Gravity Sewer Lines:

| Date | Total Miles |
|------|-------------|
| Within three (3) Years from the Date of Lodging | 150 |
| Within six (6) Years from the Date of Lodging | 300 |
| Within eight (8) Years from the Date of Lodging | All remaining Gravity Sewer Lines in accordance with **Appendix C;** |

    b.  Further, in addition to meeting the dates in Subparagraph a., above, City shall

        perform SSA activities on no less than forty (40) unique miles of Gravity Sewer Lines

        in each Calendar Year, until completion of all SSA activities in accordance with

        **Appendix C;**

c. In counting the number of miles completed for purposes of this Paragraph 10, only SSA activities commenced or completed after the Date of Lodging may be included; and

d. City shall conduct SSA activities in accordance with Paragraphs 14 and 15 of this Decree, and the process presented in **Appendix A** to this Decree.

11.    SSA activities and specific WCTS investigations shall be performed in accordance with applicable provisions of The Handbook: Sewer System Infrastructure Analysis and Rehabilitation, EPA/625/6-91/030; Existing Sewer Evaluation and Rehabilitation, WEF MOP FD 6, 3rd edition, 2009 (hereinafter "The Handbook"); A Guide to Short Term Flow Surveys of Sewer Systems, WRC Engineering (1987); the Code of Practice for the Hydraulic Modeling of Sewer Systems Version 3.001, December 2002, prepared by The Chartered Institution of Water and Environmental Management (CIWEM—formerly WaPUG): the National Association of Sewer Service Companies (NASSCO) "Manual of Practice," and sound engineering practice.

12.    SSA activities and specific WCTS investigations in individual Basins and Sub-basins shall be prioritized taking into consideration:

a. The occurrence of dry-weather and wet-weather SSOs;

b. The nature and extent of customer complaints;

c. Previous and current flow monitoring studies;

d. Location of SSOs in low-income census tract areas;

e. The causes and applicable methods of eliminating SSOs;

f. Remedial Measures already undertaken or scheduled for implementation;

18

g.  Field crew work orders; and

h.  Other relevant information.

13.    SSA activities in each Basin or Sub-basin shall begin with flow monitoring of the

discharge(s) from that Basin or Sub-basin with concurrent rainfall measurement using a rain

gauge located within the Basin or Sub-basin area tributary to the flow meter.  Such flow and

rainfall data gathered within two (2) years prior to conducting SSA activities may be

utilized.  All Gravity Sewer Lines in each Basin or Sub-basin shall be subject to the

investigations specified under Subparagraphs 14.a. through 14.g. and 15.a. through 15.c.  Such

investigations shall be sufficient to determine the condition score of the Gravity Sewer Lines

applying the NASSCO Pipe Assessment and Certification Program and the Manhole Assessment

and Certification Program rating systems as set forth on pages 3 and 4 of **Appendix A**

(hereinafter "NASSCO condition rating systems (as set forth in **Appendix A**)"), and to discover

other defects that have caused or significantly contributed to previous SSOs or that are likely to

cause or significantly contribute to the future occurrence of SSOs.

14.    SSA activities in each Basin or Sub-basin for Small-Diameter Gravity Sewer Lines shall

include the following:

a.  Smoke-testing of all Small-Diameter Gravity Sewer Lines and tributary Private

Service Lines, except those already scheduled for manhole-to-manhole internal lining

or replacement;

b.  Closed circuit television ("CCTV") inspection of all non-plastic Small-Diameter

Gravity Sewer Lines;

19

    c.  Dyed-water testing with concurrent CCTV of all parallel storm sewers proximate and above each Pipe Segment that test positive from smoke-testing to attempt to identify the specific locations where dyed-water is entering the Pipe Segment;

    d.  External visual inspection from the public right-of-way during smoke-testing of buildings in the Basin/Sub-basin under investigation to attempt to ascertain the presence of downspouts and other private property storm water drains that are connected to the WCTS;

    e.  Inspection of all manholes;

    f.  CCTV inspection of all plastic Small-Diameter Gravity Sewer Lines constructed prior to Calendar Year 1995 and all other plastic Small-Diameter Gravity Sewer Lines for which visual pipe inspections or other WCTS investigations reveal defects; and

    g.  All other Small-Diameter Gravity Sewer Line and Private Service Line investigations that City deems necessary to locate the sources of I&I that cause or contribute to SSOs and/or condition defects in the WCTS.  Use of any alternative WCTS investigation technique that City wishes to employ other than those specifically listed in Subparagraphs 14.a. through 14.f., including new technologies or methods, must be preapproved by EPA.

15.    SSA activities in each Basin or Sub-basin for Large-Diameter Gravity Sewer Lines (except pipes installed after 1995 and those that are listed in **Appendix E1** or **Appendix E2,** if actually replaced) shall include the following:

a. Inspection of all Large-Diameter Gravity Sewer Lines using CCTV, 360-degree video, laser imaging or physical entry at City's option;

b. Inspection of all manholes; and

c. All other Gravity Sewer Line and Private Service Line investigations that City deems necessary to locate the sources of I&I that cause or contribute to SSOs and/or condition defects in the WCTS. Use of any alternative WCTS investigation technique that City wishes to employ other than those specifically listed in Subparagraphs 15.a. and 15.b., including new technologies or methods, must be preapproved by EPA.

16.     The SSA activities performed in each Calendar Year pursuant to Paragraphs 10 through 15 shall be described in a Condition Assessment Report for that Calendar Year. The Condition Assessment Report for each Calendar Year shall be submitted in accordance with Section XX ("Notices") with the respective Annual Report for that Calendar Year as required and described under Section X ("Reporting") of this Consent Decree.

   C.     **Article Two:  Condition Remedial Measures**

17.     **Condition Remedial Measures from SSA Activities Conducted Prior to Date of Lodging.** The City shall remediate all defects in Basin 12 ranked 4 or 5 (applying the NASSCO condition rating systems (as set forth in **Appendix A**)) not later than twelve (12) years from the Date of Lodging. City shall submit a Remedial Measures Plan for Basin 12 with or before the first Annual Report. City shall address the remediation of defects discovered in Private Service Lines in the areas where SSAs were performed prior to the Date of Lodging through those SSA

efforts or as otherwise become known to the City in accordance with Paragraph 54. The Annual Report for each Calendar Year shall enumerate all Remedial Measures completed and the status of Private Service Line defect remediation efforts in that Calendar Year.

18.     **Condition Remedial Measures from SSA Activities Performed after Date of Lodging.** Commencing no later than the day after the Date of Lodging, City shall conduct SSA activities on Basins and/or Sub-basins identified in **Appendix C**, in accordance with Article One of Section V. After completing the SSA activities and following the process presented in **Appendix D** for the period from the Date of Lodging through December 31, 2015, and for every Calendar Year thereafter, City shall develop a Remedial Measures Plan for all Pipe Segments and manholes discovered through that SSA to be rated 4 or 5 in accordance with the NASSCO condition rating systems (as set forth in **Appendix A**), and/or discovered to have other defects that have caused or significantly contributed to previous SSOs or that are likely to cause or significantly contribute to the future occurrence of SSOs. City shall submit that Remedial Measures Plan to EPA and ADEQ in accordance with Section XX ("Notices") for review and approval on or before March 31 of the second Calendar Year following the Calendar Year in which the SSA that identified the need for those Remedial Measures was performed. City may commence design and construction of Condition Remedial Projects identified prior to approval of the Remedial Measures Plan. All Remedial Measures enumerated in each Remedial Measures Plan shall be completed as soon as technically feasible, but no later than December 31st of the fourth Calendar Year following the Calendar Year in which the SSA that identified the need for those Remedial Measures was performed (for example, all defects required to be remediated and

22

identified in the SSA completed December 31, 2015, and reported in the Remedial Measure Plan submitted on March 31, 2017, shall be remediated no later than December 31, 2019). City shall address the remediation of defects discovered in Private Service Lines through SSA efforts or as otherwise become known to the City in each Calendar Year in accordance with Paragraph 54. The Annual Report for each Calendar Year shall enumerate all Remedial Measures completed and the status of Private Service Line defect remediation efforts in that Calendar Year. In determining the condition Remedial Measures, City shall:

a. Determine the condition score of all Pipe Segments in the study area for the SSA in question, using the NASSCO condition rating systems (as set forth in **Appendix A**), and shall provide this condition score information in tabular format to EPA and ADEQ; and

b. Determine the specific Remedial Measures required for each Pipe Segment and manhole identified under Subparagraph 18.a. above through application of the remediation decision process presented in **Appendix D**.

### D.     Article Three:  Pump Station/Force Main Evaluation Report

19.     City shall complete evaluations of all Pump Stations in the WCTS as described in **Appendix B** of this Consent Decree, and shall submit to EPA and ADEQ a report of its findings in accordance with Paragraph 22 and in accordance with Section XI ("Certification, Approval and Seal by Professional Engineer"). City shall document its progress toward completing these evaluations in the Annual Reports for 2015, 2016, and 2017 as required in Section X ("Reporting") of this Consent Decree. The purpose of these evaluations shall be to determine the

23

suitability, overall performance and condition of each Pump Station, and to identify Remedial Measures required at each Pump Station to achieve the Objectives of this Consent Decree as stated in Section II.

20.    City shall conduct evaluations of all Force Mains in the WCTS as described in **Appendix B** of this Consent Decree and submit a report of its findings in accordance with Paragraph 22. City shall document its progress each Calendar Year toward completing these evaluations in the Annual Report for 2015, 2016, and 2017 as described under Section X ("Reporting") of this Consent Decree.  The purpose of these evaluations shall be to determine the suitability, overall performance and condition of each Force Main, and to identify Remedial Measures required for that Force Main directed to achieve the Objectives of this Consent Decree as stated in Section II.

21.    City shall provide dedicated alternative power supplies at all Pump Stations within the WCTS in accordance with the schedule included in **Appendix B**, and no later than December 31, 2018.  City shall provide documentation regarding the completion of installation of alternative power supplies at all Pump Stations to EPA and ADEQ in accordance with Section XX ("Notices") with or before the Annual Report due on March 31, 2019.

22.    City shall prepare and submit a Pump Station and Force Main Evaluation Report ("PS/FM Report") to EPA and ADEQ in accordance with Section XX ("Notices") with or before the Annual Report due on March 31, 2018, presenting its Pump Station evaluation efforts conducted under Paragraph 19 of this Article and its Force Main evaluation efforts conducted under Paragraph 20 of this Article.  The Pump Station and Force Main evaluations presented in the PS/FM Report shall be subject to the review and comment requirements presented in Section

24

IX ("Deliverables and Review Process") and the reporting requirements presented in Section X ("Reporting") of this Consent Decree. The Pump Station and Force Main Remedial Measures presented in the PS/FM Report shall be subject to the review and approval requirements presented in Section IX ("Deliverables and Review Process") and the reporting requirements presented in Section X ("Reporting") of this Consent Decree. The PS/FM Report shall provide narratives, analyses, calculations, exhibits, and other supporting information as required to document the various Pump-Station/Force-Main evaluations, maintenance activities, and Remedial Measures undertaken and/or planned by City to achieve the Objectives of this Consent Decree as stated in Section II and shall include, but not be limited to:

a. A detailed description of each Pump Station, including station structure, pumping equipment, controls, Supervisory Control And Data Acquisition ("SCADA") system, primary power supply, dry-weather Critical Response Time, wet-weather Critical Response Time, and then present alternative power supply or emergency pumping capability;

b. The firm pumping capacity of each Pump Station with the largest pump out of service determined by field measurement, as compared to the peak wet-weather flow rate(s) in the Gravity Sewer Line(s) tributary to that Pump Station generated by the analysis rainfalls presented in Section V, Article Four ("Capacity Assessment and Hydraulic Modeling") and as compared to the hydraulic capacity of the Force Main to which the Pump Station discharges;

c. The results of the evaluation of each Pump Station;

25

d.   The lightning strike protection equipment at each Pump Station;

e.   All measures necessary to ensure compliance with the Water Environment Federation ("WEF") Manual of Practice FD-4 (1993), "Design of Wastewater and Storm Water Pumping Stations," including, but not limited to: increasing pumping capacity, altering Station configuration, maintaining adequate supplies of critical equipment or parts, improvements in maintenance practices, and/or providing additional alternative power and lightning strike-protection measures to minimize SSOs caused by Pump Station equipment failures and/or Pump Station outages due to loss of power;

f.   Detailed descriptions of the capacity Remedial Measures, condition Remedial Measures, and/or operational improvements required at each Pump Station to achieve the Objectives of this Consent Decree as stated in Section II, and City's schedule for completing these Remedial Measures and/or operational improvements at each Pump Station;

g.   An inventory listing each Force Main, and its construction material, age (or installation date), diameter, length, typical flow rates/velocities, and maintenance history of each Force Main;

h.   A detailed summary of the condition of each Force Main, the method(s) used to determine that condition, and the relative risks and consequences of a failure of that Force Main; and

i.   Detailed descriptions of the capacity Remedial Measures, condition Remedial Measures, and/or operational improvements required for each Force Main to achieve

26

the Objectives of this Consent Decree as stated in Section II and City's schedule for

completing these Remedial Measures and/or operational improvements for each

Force Main.

23.    Pump Station and Force Main improvements and Remedial Measures identified in the

PS/FM Report shall be completed in accordance with the schedule set forth in **Appendix B**. The

City shall complete Group 1 Pump Station and Force Main improvements and Remedial

Measures no later than December 31, 2021. The City shall complete Group 2 Pump Station and

Force Main improvements and Remedial Measures no later than twelve (12) years from the Date

of Lodging.

### E.    Article Four:  Capacity Assessment and Hydraulic Modeling

24.    City has designed and constructed some WCTS improvement projects to address wet-

weather SSOs.  City has identified additional capacity Remedial Measures projects based upon

previously evaluated portions of the WCTS that are listed in **Appendix E1** ("Previously

Identified Capacity-Related Remedial Measures Projects Already Budgeted") and **Appendix E2**

("Other Previously Identified Capacity-Related Remedial Measures Projects").  In an effort to

further reduce I&I, convey flows to the WWTPs, and eliminate SSOs, City shall continue to

carry out capacity assessments and other engineering analyses of the WCTS.

25.    City shall update the hydraulic model of its WCTS no later than one (1) year from the

Date of Lodging, to reflect ongoing Capacity Assessments, SSA activities and Remedial

Measures implementation including, but not limited to, designed or completed capacity

improvements within the Sunnymede Basin, the Zero Street Basin, and the Mill Creek Basin.

27

26.     City shall continue to use XPSWMM 2011 by XP Solutions as the software platform for the computerized hydraulic model which City asserts that it has calibrated and verified as producing accurate results.  The use of more recently released versions of this software or the use of alternative software platforms for the model will be at the sole discretion of City.

27.     City shall submit a Hydraulic Model Update Report to EPA and ADEQ with or before the Annual Report due March 31, 2017, in accordance with Section XX (Notices), in which it describes how the hydraulic model was updated and confirms that all the requirements relating to the hydraulic model set forth in this Article Four have been met.  City shall utilize this updated hydraulic model to identify Capacity Constraints in the WCTS that must be eliminated to achieve the Objectives of this Consent Decree.

28.     City shall configure the updated WCTS hydraulic model to include all Pump Stations, all Force Mains, all EQ Facilities or other hydraulic control facilities, all Gravity Sewer Lines 10-inches and larger, and, all additional Gravity Sewer Lines as necessary to extend the hydraulic model at least one Pipe Segment upstream of the locations of Recurring Wet-Weather SSOs, and shall use best engineering judgment in determining which branch or branches upstream of said SSOs to include in the expanded hydraulic model.

29.     City shall update, calibrate and verify the hydraulic model to accurately represent the WCTS utilizing currently accepted engineering procedures and, to the extent practical, the general guidelines established in the Code of Practice for the Hydraulic Modeling of Sewer Systems Version 3.001, December 2002, prepared by The Chartered Institution of Water and Environmental Management (CIWEM – formerly WaPUG).  The calibration/verification process

shall be based upon not less than three data sets, including rainfall data, metered hydrographs and other WCTS flow data.

30.    City shall utilize the updated hydraulic model to identify Capacity Constraints in the WCTS that must be eliminated to achieve the Objectives of this Consent Decree.  In assessing the capacity of the WCTS, City shall run the hydraulic model using the following analysis rainfall amounts and intensity time-distributions in accordance with Technical Paper No. 40 dated May 1961 prepared by U.S. Department of Commerce Weather Bureau:

> 2-year/6-hour rainfall
>
> 5-year/6-hour rainfall
>
> 10-year/6-hour rainfall.

31.    City shall submit to EPA and ADEQ in accordance with Section XX ("Notices") a Capacity Assessment Report of the WCTS based upon the results of the updated hydraulic model required under this Article Four ("Capacity Assessment and Hydraulic Modeling") with or before the Annual Report due on March 31, 2018.  The Capacity Assessment Report shall be subject to the review and comment requirements in Section IX ("Deliverables and Review Process"), the reporting requirements in Section X ("Reporting"), and the Professional Engineer requirements in Section XI ("Certification, Approval and Seal by Professional Engineer") of this Consent Decree.  This Report may incorporate City's update to its Wastewater Management Plan at City's option.  The Capacity Assessment Report shall include, but is not limited to, the following:

a.  A description of the hydraulic model, including the brand of model software and its capabilities;

b.  Digitized map(s) and/or schematics that identify and characterize the portions of the WCTS (including Recurring SSO locations) included in the model;

c.  Identification of input parameters, constraints, assumed values and outputs;

d.  Written summary of activities undertaken to configure, calibrate and verify the hydraulic model;

e.  Written discussions and legible map identifying the locations of the Capacity Constraints in the WCTS that are identified through the updated hydraulic model;

f.  Maps depicting the locations where wet-weather SSOs are still expected to occur for each analysis rainfall listed under Paragraph 30 after all capacity improvements listed in **Appendix E1** ("Previously Identified Capacity-Related Remedial Measures Projects Already Budgeted") and the Pump-Station/Force-Main improvements developed under Article Three have been constructed; and

g.  The hydraulic design criteria utilized by City for sizing new and replacement Gravity Sewer Lines, including but not limited to: the pipe roughness coefficient and the maximum percentage-full allowed in each Pipe Segment at the peak wet-weather flow rates generated by the analysis rainfalls presented in Paragraph 30.  City's hydraulic design criteria shall be directed toward achieving the Objectives of this Consent Decree as stated in Section II.

30

**F.**    **Article Five:  Capacity Remedial Measures Plan**

32.    After updating its hydraulic model and submitting the Capacity Assessment Report as required in Article Four ("Capacity Assessment and Hydraulic Modeling"), City shall prepare a Capacity Remedial Measures Plan and submit it to EPA and ADEQ in accordance with Section XX ("Notices") for review and approval before or with the Annual Report due on March 31, 2019.  In the Capacity Remedial Measures Plan, City shall notify EPA and ADEQ which of the previously identified capacity-related projects listed in **Appendix E2** it shall construct and what additional projects, if any, beyond those listed in **Appendix E2**, it shall construct to achieve the Objectives of this Consent Decree as stated in Section II.  The Capacity Remedial Measures Plan shall be subject to the review and approval requirements in Section IX ("Deliverables and Review Process") of this Consent Decree, and the reporting requirements in Section X ("Reporting") of this Consent Decree.

33.    The Capacity Remedial Measures Plan shall provide narratives, analyses, calculations, exhibits, and other supporting information as required to document the various capacity Remedial Measures that have been or will be undertaken by City and shall include, but not be limited to:

    a.  Detailed descriptions and legible map(s) presenting:

        i.  WCTS capacity Remedial Measures completed since Calendar Year 2000;

        ii.  WCTS capacity Remedial Measures under construction as of the date of submittal of the Capacity Remedial Measures Plan; and

31

iii. WCTS capacity Remedial Measures currently planned as listed in **Appendix E1** and **Appendix E2**;

b. Hydraulic analyses of the capacity Remedial Measures included under this Article Five ("Capacity Remedial Measures Plan") comparing the sizing of each Measure to the hydraulic design criteria provided under Section V, Article Four ("Capacity Assessment and Hydraulic Modeling"), and Subparagraph 31.g. of this Consent Decree. All capacity Remedial Measures constructed after the Date of Lodging of this Consent Decree shall conform to the hydraulic design criteria provided under Section V, Article Four, Subparagraph 31.g.;

c. Detailed descriptions and legible map presenting all additional capacity Remedial Measures beyond those presented in **Appendix E2**, if any, determined to be required under Section V, Article Four ("Capacity Assessment and Hydraulic Modeling") of this Consent Decree to achieve the Objectives of this Consent Decree as stated in Section II;

d. Completion dates for the additional individual capacity Remedial Measures projects identified under Subparagraph 33.c. above, such that any additional Remedial Measures are completed no later than twelve (12) years from the Date of Lodging. City shall explain how it prioritized these projects based upon the risk and consequences of SSOs likely to occur until these capacity Remedial Measures are completed; and

32

e. City shall document its annual progress toward completing the capacity Remedial Measures identified in **Appendix E1, Appendix E2,** and Subparagraph 33.c. in each Calendar Year in the Annual Report for that Calendar Year, as described under Section X ("Reporting") of this Consent Decree.

**G.    Article Six:  Capacity-Related Remedial Measures Projects Identified in Appendices E1 and E2.**

34.    Through the capacity assessments and SSA activities City has undertaken prior to the Date of Lodging, City has identified a series of capacity-related Remedial Measures that have not yet been completed.  These Remedial Measures are presented in **Appendix E1** ("Previously Identified Capacity-Related Remedial Measures Projects Already Budgeted") and **Appendix E2** ("Other Previously Identified Capacity-Related Remedial Measures Projects").  City shall complete each Remedial Measure listed in **Appendix E1** not later than December 31st of the completion year for those Remedial Measures presented in **Appendix E1**.  As part of the Capacity Remedial Measures Plan required under Section V, Article Five, City shall notify EPA and ADEQ if it determines that any of the capacity Remedial Measures projects listed in **Appendix E2** are not necessary and shall provide detailed explanations supporting elimination of any such project.  Also as part of the Capacity Remedial Measures Plan required under Section V Article Five, City shall notify EPA and ADEQ of any changes in the project completion dates presented in Appendix E2; however, no project completion date may extend twelve (12) years past the Date of Lodging.  City shall document its annual progress toward completing the capacity Remedial Measures presented in **Appendix E1** and **Appendix E2** in each Calendar

33

Year in the Annual Report for that Calendar Year as described under Section X ("Reporting") of this Consent Decree.

### H.   Article Seven:  Development of a Capacity, Management Operation and Maintenance Program

35.   Introduction:  City shall prepare an effective WCTS Capacity, Management, Operation, and Maintenance Program ("CMOM Program") consistent with EPA's 2005 Guidance entitled "Guide for Evaluating Capacity, Management Operation and Maintenance Programs at Sanitary Sewer Collection Systems" and shall submit each component of the CMOM Program to EPA for review and approval no later than two (2) years from the Date of Lodging, except where a shorter submission date for a component is set forth in Paragraphs 37-56.   All components of the CMOM Program shall be subject to the review and approval requirements presented in Section IX ("Deliverables and Review Process") of this Consent Decree and the reporting requirements presented in Section X ("Reporting") of this Consent Decree.  City shall coordinate the implementation of this CMOM Program with the other requirements of Section V.

36.   **WCTS Maintenance Activities until Full CMOM Implementation:**  From the Date of Lodging until the date EPA approves a component of the CMOM Program as required by Paragraph 35 above, City shall, to the extent technically feasible utilizing its then current Utility Department workforce and maintenance fleet, manage that component of its CMOM Program consistent with EPA's 2005 Guidance entitled "Guide for Evaluating Capacity, Management Operation and Maintenance Programs at Sanitary Sewer Collection Systems."

34

37.     **FOG Control Program Component:** The CMOM Program shall include a Fats/Oils/Grease ("FOG") Control Program.  The City's plan for FOG Control shall be submitted within twenty four (24) months from the Date of Lodging.  Upon EPA approval of the FOG Control plan, the City shall implement the approved plan.  The FOG Control Program shall incorporate, at a minimum, the following:

    a.  A demonstration that City possesses adequate legal authority, through ordinances or otherwise, to control the discharge of FOG into the WCTS from all FOG Generators, including the authority to implement a permit and enforcement program for these sources;

    b.  A list of current FOG Generators, including a description of their FOG-generating processes and estimated average daily discharge by weight/volume or allowable discharge concentration at the City's option; and annual updating of this list;

    c.  Standards for the sizing and installation of FOG Control Devices;

    d.  FOG Control Device management, operations and maintenance standards (best management practices) that address FOG Control Device operation, onsite record-keeping requirements, cleaning frequency, cleaning standards, use of additives, and ultimate disposal of captured FOG materials in accordance with applicable State law, if any;

    e.  FOG Control Device installation inspection protocols, including scheduling, inspection report forms, and inspection record keeping requirements;

35

f.   A program requiring periodic unannounced sampling and inspections of all FOG Control Devices in operation. In conducting unannounced inspections of FOG Control Devices located inside buildings, the City may schedule such inspections so as to avoid unreasonable disruption to business operations. The Program shall include tiered sampling/inspection frequencies based upon FOG generation rates, FOG Control Device cleaning schedules, and history of FOG violations; however, sampling and inspection of each FOG Control Device shall be performed not less often than once every two years. This program shall also include FOG compliance inspection protocols, including scheduling, inspection report forms, and inspection record-keeping requirements that encourage FOG Generators to manage, operate and maintain FOG Control Devices in accordance with nationally-recognized best management practices for limiting the adverse impacts of FOG discharges on wastewater collection and treatment facilities;

g.   A requirement that the FOG Generators keep records regarding the transportation, storage and ultimate disposal of collected FOG materials;

h.   An enforcement program, including specific and tiered enforcement mechanisms, directed at achieving FOG Generators' compliance with the FOG Control Program;

i.   A compliance assistance program to facilitate training of FOG Generators in the proper operation of FOG Control Devices, use of the FOG disposal records system required under Subparagraph 37.g., and other activities required under City's FOG Control Program;

36

j.  A public education program directed at reducing the amount of FOG entering the WCTS from FOG Generators and residences, including single-family homes, multi-family homes, and apartments, consisting at a minimum of the following elements:

    i.  Distributing informational FOG door hangers to residents living immediately upstream of each grease SSO after such an event;

    ii.  Annually preparing and distributing FOG information or inserts with sewer bills so that it is visible to reader;

    iii.  Preparing and maintaining a FOG education information page(s) on its website; and

    iv.  Evaluating and implementing the most appropriate methods of educating high density residential dwelling (*i.e.* apartment buildings and condominium and townhome complexes) occupants of the impacts of FOG on the sewer system.

k.  City staffing (technical, legal and administrative) and equipment for effective implementation and ongoing operation of the FOG Control Program;

l.  A demonstration that industrial users that generate FOG are adequately monitored and inspected to ensure that these industrial users comply with their pre-treatment permits;

m.  Coordination by the City to ensure that all FOG Generators and all establishments covered by the industrial user program are monitored; and

n.  Performance indicators that will be used by City to measure the effectiveness of the FOG Control Program.

38.    **FOG Program Reporting:**  City shall report the FOG Control Program activities performed in each Calendar Year in the Annual Report for that Calendar Year as described under Section X ("Reporting") of this Consent Decree.

39.    **Root Control Program Component:**  The CMOM Program shall include a Root Control Program, which shall be submitted for review and approval no later than twelve (12) months from the Date of Lodging.  Upon EPA approval, the City shall implement the approved plan. The Root Control Program shall incorporate, at a minimum, the following:

      a.  Methods for identifying when roots are the primary or contributing cause of an SSO;

      b.  A plan for the reactive removal of root intrusions when City determines that roots were the cause or a contributing cause to a SSO;

      c.  A plan for proactively preventing root intrusion from causing or contributing to SSOs, whether by use of chemicals or by physical means, particularly in those Pipe Segments where root intrusions have occurred in the past;

      d.  A plan for repairing or replacing Pipe Segments that have been damaged by roots; and

      e.  A plan for notifying private property owners whenever City obtains information that roots in Private Service Lines have apparently caused or contributed to the occurrence of a Private Service Line Release and a procedure for addressing defects in Private Service Lines in accordance with the Private Service Line Defect Remediation Program in Paragraph 54.

40.    **Root Control Program Reporting:** City shall report the Root Control Program activities performed in each Calendar Year in the Annual Report for that Calendar Year as described under Section X ("Reporting") of this Consent Decree.

41.    **Gravity Sewer Line Cleaning Component:** The CMOM Program shall include a Gravity Sewer Line Cleaning Program. The City's plan for Gravity Sewer Line Cleaning shall be submitted for review and approval no later than twelve (12) months from the Date of Lodging. Upon EPA approval, the City shall implement the approved plan. For the purposes of this Paragraph 41, cleaning is defined as removal from the gravity sewer system of FOG, debris, roots and/or any other obstructions that have caused or significantly contributed to previous SSOs; and/or, that are likely to cause or significantly contribute to the future occurrence of SSOs. The Cleaning Program shall incorporate, at a minimum, the following:

   a. **A Targeted Cleaning Program for Pipe Segments with Frequent Blockages.** City shall continue its targeted cleaning program in the areas of recurring blockages and/or Recurring Dry-Weather SSOs employing cleaning frequencies required to prevent SSOs based on historical SSO information, CCTV investigations, customer complaints, FOG Program findings when available, and previous sewer cleaning investigations. The CMOM Program shall provide the criteria City uses to place a Pipe Segment in this program, the rationale for the initial frequency of cleaning chosen, and the methodology used for changing cleaning frequencies; and

   b. **A Small-Diameter Gravity Sewer Line Cleaning Program.** The City shall implement a system-wide proactive cleaning program whereby it cleans all Small-

Diameter Gravity Sewer Lines in the WCTS at least once every eight (8) Calendar Years.  City shall clean a minimum of ten (10) percent of the length of Small-Diameter Gravity Sewer Lines in the WCTS per Calendar Year.  However, if City cleans more than ten (10) percent of the length of Small-Diameter Gravity Sewer Lines in one Calendar Year (such as 2016) it may "bank" or count the excess length that was cleaned in that Calendar Year (2016) towards meeting the ten (10) percent annual minimum cleaning requirement in the following Calendar Year (2017), and only the following Calendar Year.  Multiple cleanings of the same Pipe Segments may not be counted more than once in any Calendar Year.  In calculating its conformance with the ten (10) percent minimum annual cleaning requirement, and provided that there is no double-counting of the same pipe segment (as explained in the preceding sentence), City may include all Gravity Sewer Lines cleaned pursuant to Section V Article One of this Consent Decree and as follows:

    i.  The targeted cleaning program;

    ii.  SSA activities;

    iii. CCTV inspections;

    iv. Root removal operations;

    v.  CMOM CSSA Program activities;

    vi. All other WCTS cleaning services for any purpose, whether performed by City crews, Consultants or Contractors; and

vii.   Should City desire to use an emerging technology to evaluate whether Pipe
Segments need to be cleaned (such as SL-RAT), it may seek permission from
EPA to use such technologies. If EPA approves, then City may commence
utilizing such technologies upon approval.

c. **Large-Diameter Gravity Sewer Line Cleaning Program**. City shall clean all
Large-Diameter Gravity Sewer Lines on a ten (10)-year cycle as warranted. City
shall clean each Large-Diameter Gravity Sewer Line Pipe Segment that City
determines, based upon inspection results and other analyses, to have buildups of
FOG, grit, debris, roots or other materials in any part of that Pipe Segment that
obstruct greater than twenty (20) percent of the pipe diameter. By the following
dates, City shall have completed cleaning activities on the following minimum
number of unique miles of Large-Diameter Gravity Sewer Lines:

| Date | Total Miles |
| --- | --- |
| Three (3) Years from Date of Lodging | 8 |
| Six (6) Years from Date of Lodging | 16 |
| Ten (10) Years from Date of Lodging | All remaining miles of Large-Diameter Gravity Sewer Lines. |

42.   **Cleaning Program Reporting:** City shall report the WCTS Cleaning Program activities
performed in each Calendar Year in the Annual Report for that Calendar Year as described under
Section X ("Reporting") of this Consent Decree.

43.   **Continuing Sewer System Assessment Program Component:** The CMOM Program
shall include a Continuing Sewer System Assessment Program ("CSSA"). The City's plan for

41

the CSSA shall be submitted within twenty-four (24) months from the Date of Lodging. This Program shall begin following the completion of all SSA activities as described under Section V, Article One of this Consent Decree. Sub-basins 10-4, 22-2, and 22-4 as identified in the SSA reports listed by City under Section V, Article One ("Sewer System Condition Assessments"), Paragraph 10 shall be the first priority for CSSA activities. CSSA activities shall include periodic CCTV, manhole inspection, and other investigations. Further, any Remedial Measures identified as a result of this ongoing CMOM CSSA Program shall be developed in accordance with **Appendix D** ("Remediation Determination Process"). City shall address the remediation of defects discovered in Private Service Lines through CSSA efforts or as otherwise become known to the City in accordance with Paragraph 54. CSSA activities performed, the respective WCTS Remedial Measure completed, and the status of Private Service Line remediation efforts in each Calendar Year shall be presented in the Annual Report for that Calendar Year as described in Section X ("Reporting") of this Consent Decree.

44.    The CSSA Program shall include, but not be limited to:

      a.   CCTV inspection of non-plastic Small-Diameter Gravity Sewer Lines not less frequently than once every twelve (12) Years;

      b.   CCTV inspection of plastic Small-Diameter Gravity Sewer Lines, fully CIPP-lined non-plastic Small-Diameter Gravity Sewer Lines and all Large-Diameter Gravity Sewer Lines not less frequently than once every twenty (20) Years;

      c.   Visual manhole inspection not less frequently than once every eight (8) Years; and

42

      d. All other system investigations deemed necessary by City to assure continued

         operation of the WCTS in accordance with the Objectives of this Consent Decree.

45.   **Continuing Pump Station and Force Main Evaluation and Maintenance Program:**

The CMOM Program shall include a Continuing Pump Station and Force Main Evaluation and

Preventive Maintenance Program. The City's plan for continuing pump station and force main

evaluation shall be submitted within twenty-four (24) months from the Date of Lodging. This

program shall be conducted at least once every five (5) Calendar Years, beginning in Calendar

Year 2023. Pump Station and Force Main evaluations and preventive maintenance activities

performed in each Calendar Year shall be described in the Annual Report for that Calendar Year

as described in Section X ("Reporting") of this Consent Decree. The Program shall incorporate,

at a minimum, the following:

      a. Continuing evaluation of Pump Station performance and capacity considering future

         growth of City;

      b. A Routine Pump Station Operations Program to ensure proper Pump Station operation

         to prevent Pump Station failures, which shall include, at a minimum:

            i. Procedures for reading and recording information appropriate to each Pump

               Station including, as applicable, pump run-time meter readings, start counters,

               amperage readings, checking and resetting conditions, wet-well points, grease

               accumulations and any other information that is necessary for the proper

               operation of a Pump Station;

    ii. Standard inspection routes and schedules such that Pump Stations having firm capacities greater than five (5) MGD and those Pump Stations without SCADA shall be inspected daily, and all other Pump Stations shall be inspected no less often than two (2) times per week; and

    iii. Standard forms, records and performance measures to be incorporated into the City's IMS.

c. An Emergency Pump Station Operations Program that shall establish written emergency operating procedures in the event of Pump Station failure and shall include, at a minimum, the following:

    i. Applicable manufacturers' representative emergency contact information;

    ii. Operational procedures for activating and deactivating auxiliary power systems at each Pump Station;

    iii. Location(s) of portable pumping and power generating equipment;

    iv. Guidance for installing portable pumps during high flow periods;

    v. Applicable contingency plans to prevent the occurrence of SSOs from the tributary WCTS; and

    vi. Standard forms, records and performance measures to be incorporated into the City's IMS.

d. A Pump Station Preventive Maintenance Program that shall establish all standard procedures for the monitoring of Pump Station performance and schedules for preventive maintenance and equipment replacement required to achieve the

44

Objectives of this Consent Decree as stated in Section II. In addition, the Pump

Station Preventive Maintenance Program shall also include the following evaluations:

i.   Evaluation of dry-weather and wet-weather Critical Response Time of each

Pump Station;

ii.  Evaluation of the general condition of each Pump Station based upon physical

inspection and recent operating/mechanical failure history over not less than

the previous three (3) Calendar Years;

iii. Evaluation of the adequacy of station design and equipment for peak wet-

weather wastewater flow conditions anticipated within the next five (5) Years,

including redundancy of pumps, of the electrical power supply, and of the

other equipment installed; and

iv.  Evaluation of staffing and equipment required to take corrective action within

the dry-weather and wet-weather Critical Response Times calculated for each

Pump Station to prevent the occurrence of SSOs from tributary Gravity Sewer

Lines and manholes.

46.   **Continuing Capacity Assurance Program:** The CMOM Program shall include a

Continuing Capacity Assurance ("CCA") Program. The City's plan for CCA shall be submitted

within twenty-four (24) months from the Date of Lodging. The CCA Program shall be

conducted at least once every five (5) Calendar Years, beginning ten (10) Years from the Date of

Lodging. The CCA Program activities performed in each Calendar Year shall be described in

the Annual Report for that Calendar Year in accordance with Section X ("Reporting") of this

45

Consent Decree.  The capacity Remedial Measures identified in each Calendar Year through CCA Program activities required to achieve the Objectives of this Consent Decree as stated in Section II shall also be presented in the Annual Report for that Calendar Year.

    a.  The CCA Program shall include at a minimum:

        i.  All Gravity Sewer Lines ten (10) inches and larger;

        ii.  All Pump Stations;

        iii.  All Force Mains;

        iv.  All Equalization Facilities and other flow control facilities; and

        v.  All other WCTS components included in previous capacity assessment efforts conducted by City.

    b.  The CCA Program shall be coordinated with the Capacity Assessment activities completed under Article Four ("Capacity Assessment and Hydraulic Modeling") of this Consent Decree and capacity Remedial Measures activities conducted under Section V, Article Five ("Capacity Remedial Measures Plan") of this Decree.

    c.  CCA activities shall be performed in accordance with Section V Article Four ("Capacity Assessment and Hydraulic Modeling") of this Consent Decree considering:

        i.  All WCTS Remedial Measures identified through the condition and capacity Remedial Measures projects that are required to achieve the Objectives of this Consent Decree as stated in Section II;

        ii.  Continuing Pump Station and Force Main Evaluations;

        iii.  Anticipated population growth in the WCTS service area not less than ten (10) Calendar Years after the date when each CCA cycle is initiated;

        iv.  SSO reports and other WCTS operational complaints;

        v.  Citizen complaints; and

        vi.  WCTS maintenance records.

47.    **SSO Reporting Component:**  The CMOM Program shall include SSO Documentation and SSO Reporting Requirements. City shall submit its plan for SSO Documentation and Reporting within twelve (12) months from the Date of Lodging. Upon approval, City shall implement the approved plan. City shall report all SSOs in the WCTS regardless of where the SSO occurred or whether the SSO occurs during wet weather or dry weather. SSO Reporting shall include at a minimum:

      a.  Immediate SSO Reporting. All SSOs shall be reported to both EPA and ADEQ utilizing ADEQ's Sanitary Sewer Overflow (SSO) Online Report system, available on ADEQ's website, within twenty-four (24) hours of when City first became aware of the SSO. In instances where the ADEQ online reporting system is not available, City shall meet the immediate reporting requirement by submission to ADEQ's Enforcement Branch of the Water Division by facsimile using a printed version of ADEQ's online report form, or a form which presents the ADEQ required information in essentially the same format. In instances where the ADEQ online reporting and ADEQ facsimile reporting are not available, City shall report to

ADEQ's Enforcement Branch of the Water Division on or before the next business
day by telephone;

b. <u>Monthly Reporting Requirements.</u>  With City's Monthly Discharge Monitoring
Reports ("DMRs"), City shall continue to provide printed copies to EPA of all
Immediate SSO Reports submitted to ADEQ during that reporting period, directed to
6EN-WC-Water Enforcement and to ADEQ, directed to NPDES Enforcement
Section, Water Division; and

c. <u>Annual Reporting Requirements.</u>  City shall submit a Tabulation of the SSOs
occurring in each Calendar Year as part of the Annual Report for that Calendar Year
in accordance with Section X ("Reporting") of this Consent Decree.

48. **SSO Emergency Response Program Component:**  The CMOM Program shall include
a Sanitary Sewer Overflow Emergency Response Program ("OERP").  The City's plan for OERP
shall be submitted within twelve (12) months from the Date of Lodging.  Upon approval, City
shall implement the approved plan.

a. The execution of the OERP shall, at a minimum, result in:

i.   All SSOs being responded to and halted as rapidly as technically feasible,
consistent with safety and other legal requirements;

ii.  SSO mitigation measures being employed whenever appropriate to minimize
human health and environmental risks;

iii. Appropriate steps being implemented to prevent SSO recurrence; and

    iv.    Timely and complete reporting of all SSOs in accordance with the SSO reporting requirements presented in Paragraph 47 of this Consent Decree.

b. Regarding the response procedures for SSOs, the OERP shall include at a minimum:

    i.    An adequate methodology for estimating the volume of SSOs, including but not limited to, using the earliest start time when City learned of the SSO and using the known end time of the SSO;

    ii.    A description of the methods City shall use, when required by a permit or applicable law, to notify the public (through the local news media or other means, including signs or barricades to restrict access) or any applicable governmental authorities of the occurrence of an SSO;

    iii.    A detailed description of the steps to be taken to minimize the volume and/or duration of the SSO;

    iv.    A description of City's follow-up process for SSO cleanup;

    v.    A description of the WCTS investigation efforts that City shall perform to determine the cause(s) of each SSO after its cessation.  Investigations shall commence as soon as technically feasible, but not later than seven (7) Days after cessation of the SSO.  No WCTS investigations are required for Recurring Wet-Weather SSOs if City believes they are caused solely by previously-documented Capacity Constraints in the Pipe Segments downstream from the SSO locations, and if no sewer system cleaning or other maintenance activities were required to stop the prior SSOs at that location;

49

vi.    A description of response procedures for SSOs that occur at Pump Stations or Force Mains.  In the event that a repair at a Pump Station or Force Main may cause or lengthen the time of an SSO, the OERP shall provide a procedure for determining when a wastewater pump-around is required;

vii.    A provision that the IMS maintain records on SSOs for a minimum of ten (10) Years after their occurrence; and

viii.    A detailed plan describing the procedures that City shall follow in responding to a Building/Private Property Backup, including:

    1.   The timeframe objectives for responding to calls reporting potential backups;

    2.   The process used to determine whether a reported backup was caused by conditions in the Private Service Line or in the WCTS into which the Private Service Line connects;

    3.   The methods for communicating with customers about how and where to report potential backups;

    4.   A description of the methods for communicating with customers the results of City's investigation into whether the backup was caused by conditions in a Private Service Line or whether the backup was a Building/Private Property Backup; and

5. A description of the methods for communicating with customers about how to obtain clean up support from City if City determines that a backup was a Building/Private Property Backup.

49. **OERP Reporting:** City shall submit a Tabulation of the OERP activities performed in each Calendar Year as part of the Annual Report for that Calendar Year in accordance with Section X ("Reporting") of this Consent Decree.

50. **Information Management System:** The CMOM Program shall include City's plan for modifying City's Information Management System ("IMS") for tracking of operation/maintenance efforts in response to SSOs, for reporting of SSO occurrences to regulatory agencies and the public, for stopping SSOs, and for implementing corrective actions to prevent future SSOs. The City's plan for modifying its IMS shall be submitted within twenty-four (24) months from the Date of Lodging. Upon approval, City shall implement the approved plan. Within five (5) years from the Date of Lodging, City shall have functionally completed the integration of its electronic work order system and its Graphical Information System ("GIS") with the IMS for the WCTS.

51. City's IMS shall be capable of producing lists and descriptions of service requests and/or complaints from customers or others regarding SSOs that occur and the actions taken by City to stop those SSOs during each Calendar Year until termination of this Consent Decree. City shall maintain in its records (electronically or otherwise), and on the City's IMS, information on all CMOM-related WCTS investigations, assessments, construction of Remedial Measures, and

other WCTS maintenance activities for a minimum of ten (10) Years after those activities are completed.

52.　　City shall submit a narrative of the IMS improvement activities performed in each Calendar Year as part of the Annual Report for that Calendar Year in accordance with Section X ("Reporting") of this Consent Decree.

53.　　**Standard Operating Procedures Component:**  The CMOM Program shall include a plan and schedule for developing Standard Operating Procedures ("SOPs") for general operation and maintenance of all components of the WCTS, including Gravity Sewers, manholes, Pump Stations, Force Mains, and all other major ancillary facilities.  The City shall submit its plan for SOPs within eighteen (18) months from the Date of Lodging.  Upon approval, City shall implement the approved plan.  SOPs shall include all major work tasks required for the successful operation and maintenance of WCTS components including, but not limited to:

　　　a.　Gravity Sewer Line and manhole cleaning and routine maintenance;

　　　b.　Gravity Sewer Line CCTV and other internal inspections, including application of a nationally-recognized infrastructure condition scoring system that objectively rates the relative severities of the defects discovered;

　　　c.　Manhole inspections, including application of a nationally-recognized infrastructure condition scoring system that objectively rates the relative severities of the defects discovered;

　　　d.　Gravity Sewer Line and manhole construction, renewal, rehabilitation and repair performed by City crews;

52

    e.  Pump Station general inspection, specific component inspection and testing, routine maintenance, and long-term maintenance to prevent Pump Station failures. Pump Station components include, but are not limited to: pumps, motors, engines, flow control valves, check valves, operating controls, electrical systems, SCADA systems and emergency power systems;

    f.  Pump Station operational procedures, including adjustment/calibration of pump controls and operation of the alternate power system;

    g.  Force Main and ancillary component inspection, routine maintenance and long-term preventive maintenance. Force Main ancillary components include, but are not limited to: check valves, flow control valves, air release valves, and vacuum breakers;

    h.  WCTS ancillary component inspection, routine maintenance, and long-term preventive maintenance. WCTS ancillary components include, but are not limited to: flow splitting/combining structures and equipment, flow control devices, flow measurement devices, and EQ Facilities; and

    i.  All major work tasks required under the OERP for responding to and resolving SSOs and blockages in Gravity Sewer Lines, SSOs as a result of Pump Station malfunctions and/or hydraulic overloading, and SSOs resulting from Force Main failures.

54.  **Private Service Line Defect Remediation Program Component**. The CMOM Program shall include a Private Service Line Defect Remediation Program to encourage Private Service Line owners to remediate Private Service Line defects that are sources of I&I and/or

otherwise contribute to SSOs that have been discovered by the City through its SSA activities, CSSA activities, and other WCTS operation/maintenance efforts. The City's plan for the Private Service Line Defect Remediation Program shall be submitted within twenty-four (24) months from the Date of Lodging. Upon approval, the City shall implement the approved plan. This Program shall include, at a minimum:

a. A demonstration that City already possesses adequate legal authority, through ordinances or otherwise, to require owner(s) to repair, rehabilitate, replace, or take other appropriate action to prevent Private Service Lines from contributing I&I to the WCTS that could cause or contribute to SSOs;

b. An escalating notification process in which City shall notify owner(s) of defective Private Service Lines of their obligation to prevent the Private Service Line from contributing I&I to the WCTS that could cause or contribute to SSOs;

c. An escalating penalty system to encourage owner(s) to expeditiously remediate defective Private Service Lines, including the right to discontinue sewer/water service for failure to comply with remediation orders within the time limits specified in those orders subject to the property owner's due process rights under local, State and Federal law; and

d. A requirement that remediation of defects identified after the Date of Lodging shall be completed as rapidly as technically feasible, but no later than thirty (30) months after the discovery of the defective Private Service Lines contributing I&I to the WCTS that could cause or contribute to SSOs, unless the owner of the Private Service

54

Line in question qualifies for the SEP program described in **Appendix F**, in which case the defect shall be remedied within the first six (6) years of implementation of the SEP.

55.     **Comprehensive Training Program Component:**  The CMOM Program shall include a Comprehensive Training Program ("CTP") for technical and skills training for appropriate categories of the City's employees.  The City's plan for CTP shall be submitted within eighteen (18) months from the Date of Lodging.  Upon approval, the City shall implement the approved plan.  The training shall be directly related to operation and maintenance of the sanitary sewer collection system for the purpose of responding to and preventing SSOs.  Technical and skills training shall be devised to achieve the Objectives of this Consent Decree as stated in Section II.  The CTP shall include at a minimum:

   a.  A list and description of the categories of employees who will be provided training in specific topics related to SSO prevention and response measures that can be addressed through operation and maintenance of the collection system, with specific training commensurate with the specific job responsibilities of each category of employee;

   b.  A list and description of the topics to be covered in technical and skills training for each relevant category of employee, including where appropriate: training on sewer cleaning, FOG inspection, collection system inspection, collection system repair, replacement and rehabilitation techniques, data collection, information management, reporting and recordkeeping necessary to implement the City's CMOM Program.

    c.  A list of City employee training categories and description of the technical and skills training to be covered for each relevant category of employee;

    d.  A description of how the training relates to any applicable employee certification required by State or Federal law; and

    e.  A description of the record keeping system of employee technical training, skills training and safety training (whether on-the-job, or otherwise).

56.   **Inventory Management System:** The CMOM Program shall include an Inventory Management System for all spare parts and equipment components required for the prevention of SSOs and continued operational viability of the WCTS. The City shall submit a written demonstration of its completed Inventory Management System within twenty-four (24) months of the Date of Lodging. City shall prepare a written summary of the activities performed in each Calendar Year directed toward improving its Inventory Management System in the Annual Report prepared for that Calendar Year in accordance with Section X ("Reporting") of this Consent Decree. The Inventory Management System shall include at a minimum:

    a.  An inventory control system for tracking spare parts usage, prioritizing spare parts purchase and stockpiling, and generating reports on spare parts inventory control;

    b.  A system for vehicle fleet preventive maintenance and replacement that maximizes the availability of City vehicles and equipment for WCTS operation and maintenance activities; and

    c.  A listing of sources of rental and loaner vehicles and equipment available for City use during times of emergency or when City vehicles and/or equipment are out of service.

**I.**     **Article Eight:  Assessment and Remediation Plan for Effluent Limit Exceedances at the Massard WWTP and P Street WWTP**

57.     EPA reviews of DMR data for Calendar Years 2011-2013, and January-June 2014 indicate that City reported several effluent limit exceedances for both of its NPDES permits.  At the P Street Plant (AR0033278), City reported exceedances of effluent limits for the following parameters: pH, ammonia nitrogen, fecal coliform, and total suspended solids.  At the Massard Plant (AR0021750), City reported exceedances of effluent limits for the following parameters: pH, total suspended solids, ammonia nitrogen, and fecal coliform.  City shall determine the root causes of these exceedances, identify the appropriate remedial measures to correct these root causes, and implement the remedial measures for each of the WWTPs in accordance with the following:

a.  Perform an assessment of exceedances at the WWTPs to determine the root causes of such exceedances and identify appropriate remedial measures to correct these root causes;

b.  Develop a remedial action plan for effluent limit exceedances at each WWTP based upon the findings of the assessment of exceedances to implement the remedial measures identified.  The assessment findings and remedial action plan for each WWTP shall be submitted to EPA and ADEQ for review and comment no later than eighteen (18) months from the Date of Lodging;

c.  Upon receipt of each remedial action plan for WWTP effluent limit violations, EPA and ADEQ shall review the plans and may provide comments to City in accordance with Section IX ("Deliverables and Review Process") of this Consent Decree;

    d. Implement all operational changes recommended in the plans as soon as technically feasible, but no later than six (6) months after submission of the plans;

    e. Complete the recommended remedial actions, if any, at the P Street WWTP and interim remedial actions at the Massard WWTP as soon as technically feasible, but not later two (2) years after submission of the remedial action plan(s); and

    f. Complete any long-term remedial actions required at the Massard WWTP to meet permit limits as soon as technically feasible, but not later than seven (7) Years from the Date of Lodging.

**J.    Article Nine:  Schedule Reconsideration Based on Financial Circumstances.**

58.    The schedule for completion of all Remedial Measures under Articles Two, Three, Five, Six and Eight of Section V of this Consent Decree shall be as expeditious as practicable, but no later than twelve (12) years from the Date of Lodging, unless the City demonstrates in an updated Financial Capability Assessment (to be submitted on or before six (6) years from the Date of Lodging), that the expected per household cost of complying with Section V of this Consent Decree for the period ending twelve (12) Years after the Date of Lodging will cause City's cost per household to exceed two and one-half (2.5) percent of the Median Household Income ("MHI") for City's entire service area, calculated using EPA's "Combined Sewer Overflows Guidance for Financial Capability Assessment and Schedule Development," EPA 8320B-97-004, published February 1997 ("EPA's Financial Capability Assessment Guidance"). The City shall have only one opportunity to submit an updated Financial Capability Analysis under this Article Nine.

59.     The deadlines for submission of the components of the CMOM Program as set forth in

Article Seven, and the deadlines for implementing those components, shall not be subject to a

request for an extension under this Article Nine.

60.     The request for an extension of the schedule for completing Remedial Measures shall be

provided at the same time as the updated Financial Capability Assessment, and must include a

demonstration, complete with supporting documentation, that:

        a.  The Residential Indicator exceeds two and one-half (2.5) percent when calculated in

            accordance with EPA's Financial Capability Assessment Guidance as modified by

            the requirements in Paragraphs 61 and 62 below;

        b.  A description of each Remedial Measure requirement under Articles Two, Three,

            Five, Six or Eight of Section V, and its associated approved deadline, for which City

            seeks an extension;

        c.  Each requested deadline extension is as short as reasonably possible, but in no event

            exceeds five years from the deadline approved by EPA for the Remedial Measure(s)

            in question; and

        d.  In no event may a request for an extension under this Article Nine result in any

            deadline for completing any Remedial Measure, or any other obligation under this

            Consent Decree, to extend beyond seventeen (17) years from Date of Lodging.

61.     To determine City's MHI as required by Paragraph 60, City shall use the most current

MHI data from either the Federal Census or the American Community Survey ("ACS"),

whichever is most current.  If the ACS data is most current, the three-year estimate of MHI provided in the ACS data should be used.

62.     To calculate and determine City's Residential Indicator at the time a schedule extension request is submitted, City shall use the following inputs:

    a.   Current wastewater and sewer annual operation and maintenance expenses calculated as total expenses less depreciation in City's Comprehensive Annual Financial Report ("CAFR") for the most recent year, but only if the CAFR accurately states City's operation and maintenance expenses.  If City's CAFR for the most recent year does not accurately state its operation and maintenance expenses, City shall calculate and determine this input with appropriate accounting records, including source documents, and submit to the United States copies of the accounting records and source documents.

    b.   Current wastewater and sewer annual debt service calculated as the total principal and interest payments on bonds and notes from the financing activities section of the cash flow statement in City's CAFR for the most recent year, but only if the CAFR accurately reflects the principal and interest payments.  If City's CAFR for the most recent year does not accurately state its principal and interest payments, City shall calculate and determine this input with appropriate accounting records, including source documents, and shall submit to the United States copies of the accounting records and source documents;

    c.   Reasonable documented engineering estimates projecting the increase in operation

and maintenance expenses expected after completing all Remedial Measures as expressed in value of dollars for the year during which City submits the schedule extension request;

d.  The annual debt service costs based on the expected financing of a reasonable, documented engineering estimate of the costs of conducting the work under Section V, as expressed in the value of dollars during the year that the City submits the schedule extension request, provided that the City documents that it has financed or will finance the costs of conducting the Section V work included in the engineering estimate, and that such borrowed funds are available solely for the costs of conducting the Section V work.  To support the City's calculation of this input, City shall submit to the United States an explanation of the basis for, and calculation of, the annual cost estimate and the engineering estimates, accounting records, and source documents on which City relied to calculate this input;

e.  When calculating City's residential share of wastewater treatment costs in accordance with EPA's Financial Capability Assessment Guidance, City shall use the most recent year of Federal Census or ACS data, and utility billing data, to determine the portion of wastewater flow attributable to households in the service area.  The City also shall use the same ratio between total wastewater flow and residential infiltration and inflow that it uses for rate setting purposes, if any, to calculate the residential share of wastewater treatment costs;

61

    f.   When calculating the total number of households in City's service area, City shall count as one distinct household each occupied housing unit as defined by the US Census and ACS, but shall not count occupied housing units that have onsite sewage disposal systems and are not paying wastewater sewer fees to City.  The City shall use ACS and Federal Census data, and as necessary GIS mapped data, to accurately estimate the total number of households in City's service area; and

    g.   Data and analysis submitted with the City's demonstrations, illustrations, and supporting materials shall include functional and operational spreadsheets with all formulas intact.

63.    In addition to the calculation of the Residential Indicator as required in Subparagraphs 62(a) through (g), the City may submit an additional calculation of the Residential Indicator using alternative inputs that the City contends produce a more accurate calculation of the Residential Indicator, provided such inputs are consistent with EPA's Financial Capability Assessment Guidance;

64.    If the United States, after consultation with the State of Arkansas, denies in writing, in whole or in part, City's request for an extension, City may pursue dispute resolution pursuant to Section XIV of this Consent Decree ("Dispute Resolution").  Additionally, if more than ninety (90) Days elapses from the date that City submitted a request for an extension, and (1) City has not received a written response from the United States; or (2) the Parties have not reached an agreement on the request for an extension, City may pursue dispute resolution pursuant to Section XIV of this Consent Decree ("Dispute Resolution").  If the Parties reach an agreement

on an extension under this Article Nine, such agreement shall be subject to the process set forth in Section XXIII ("Modification") of this Consent Decree.

65.     If City invokes the dispute resolution procedures of Section XIV of this Decree ("Dispute Resolution") in connection with a request for a schedule extension under this Article, the invocation of dispute resolution procedures shall not extend, postpone, or affect in any way any of the City's obligations pursuant to this Consent Decree unless and until final resolution of the dispute so provides.

## VI.     MITIGATION PROGRAM REQUIREMENT

66.     Within one (1) Year from the Date of Lodging City shall implement a program to identify the introduction of pollutants, including but not limited to sewage, into the City's storm system (the "Mitigation Requirement"). The Mitigation Requirement shall consist of baseline and wet weather monitoring, to include monitoring of storm water outfalls at "J" Street, Massard Creek, Mill Creek, "P" Street, and Sunnymede.

67.     The baseline monitoring will be performed on a quarterly basis for one year. The baseline monitoring will be conducted during dry weather and no less than ten (10) days after a rain event. In the event of no flow during a quarter, a sample will not be collected. The quarterly baseline samples will be a grab sample and will be analyzed for the following constituents: Turbidity; Conductivity; pH; Total Suspended Solids (TSS); Total Phosphorous; Nitrate+Nitrite Nitrogen; Chloride; Sulfate; Total Dissolved Solids (TDS); Chemical Oxygen Demand (COD); Antimony; Arsenic; Barium; Beryllium; Cadmium; Chromium; Copper;

Nickel; Lead; Selenium; Silver; Zinc; Bisphenol-A; Estradiol; Ibuprofen; Naproxen; Sucralose; and Triclosan.

68.    Rain events will be collected by two different methods. An automated sampler will be utilized with a rain or flow actuator to collect discrete samples. A minimum of five (5) discrete samples from each site for two separate rain events (*i.e.*, ten (10) samples for each site per quarter) will be analyzed for the following: Turbidity, Conductivity, Total Suspended Solids (TSS), Total Phosphorous, Nitrate+Nitrite Nitrogen, Chloride, Sulfate, Total Dissolved Solids (TDS), Chemical Oxygen Demand (COD), Antimony, Arsenic, Barium, Beryllium, Cadmium, Chromium, Copper, Nickel, Lead, Selenium, Silver, and Zinc. A quarterly rain event manual grab sample will be collected and analyzed for the following: pH, Bisphenol-A, Estradiol, Ibuprofen, Naproxen, Sucralose, and Triclosan. If there is not a substantial rain event to cause runoff or increase flow, or there is not a rain event during the quarter, this program shall be continued until the minimum samples required under this Paragraph have been taken.

69.    To ensure the samples are collected during the rain events, automated samplers will be purchased and installed at each location to collect the rain event samples. The following equipment and actions will need to be purchased and installed at each of the sample site locations:

          a.   Automated samplers pad and protective box; and

          b.   Automated samplers with actuator and rain gauge.

70.    The City will begin implementation of the Mitigation Program within one (1) Year of the Date of Lodging of the Consent Decree, as follows:

64

a. The City will submit a Quality Assurance Project Plan ("QAPP") to EPA for review and comment within one (1) Year of the Date of Lodging;

b. The City will install the sampling equipment at the sampling locations within ninety (90) Days of the submittal of the QAPP to EPA;

c. The City will begin sampling of the sites within sixty (60) Days following the completion of the installation of the sampling locations; and

d. The City shall submit the final report, including all data from the analysis, to EPA for review and comment within six (6) months following the completion of all sampling activities under this Section VI.

## VII.    CIVIL PENALTIES

71.    The City shall pay to the United States as a civil penalty the sum of three hundred thousand dollars ($300,000). The payment shall be made within sixty (60) days after the Date of Entry. Payment shall be made by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with instructions to be provided to Defendant following the Date of Lodging, and upon City's request, by the Financial Litigation Unit of the U.S. Attorney's Office for the Western District of Arkansas. At the time of the payment, the City shall simultaneously send written notice of payment identifying the payment as a civil penalty and a copy of any transmittal documentation (which should reference DOJ case number 90-5-1-1-08677 and the civil action number of this case) to the United States in accordance with Section XX of this Decree ("Notices").

## VIII.   SUPPLEMENTAL ENVIRONMENTAL PROJECT

72.     The City shall satisfactorily implement and complete a Supplemental Environmental

Project ("SEP") involving a grant program for the repair or replacement of Private Service Lines

for those property owners that qualify as low-income residential property owners in accordance

with **Appendix F** ("Private Service Line SEP").   The purpose of the Private Service Line SEP is

to reduce extraneous flows, including I&I, caused by defects in residential Private Service Lines

from entering the WCTS.  The City shall complete construction of the replacement of the Private

Service Lines of eligible property owners no later than eleven (11) years from the Date of

Lodging of the Consent Decree.

73.     With regard to the SEP, the City certifies the truth and accuracy of each of the following:

     a.   That all cost information provided to EPA in connection with EPA's approval of the

        SEP in Paragraphs 72-78 is complete and accurate and that the City in good faith

        estimates that the cost to implement the SEP is at least four hundred thousand dollars

        ($400,000);

     b.   That, as of the date of executing this Consent Decree, the City is not required to

        perform or develop the SEP by any federal, state, or local law or regulation and is not

        required to perform or develop the SEP by agreement, grant, or as injunctive relief

        awarded in any other action in any forum;

     c.   That the City is not a party to any open federal financial assistance transaction that is

        funding or could be used to fund the same activity as the SEP, and that there is no

        such open federal financial assistance transaction that is funding or could be used to

fund the same activity as the SEP, nor has the same activity been described in an
unsuccessful federal financial assistance transaction proposal submitted to EPA
within two (2) years of the date of the City's execution of this Consent Decree (unless
the project was barred from funding as statutorily ineligible).  For purposes of this
certification, the term "open federal financial assistance transaction" refers to a grant,
cooperative agreement, loan, federally-guaranteed loan guarantee, or other
mechanism for providing federal financial assistance whose performance period has
not yet expired;

    d.  That the SEP is not a project that the City was planning or intending to construct,
perform, or implement other than in settlement of the claims resolved in this Consent
Decree;

    e.  That the City has not received, and will not receive, credit for the SEP in any other
enforcement action; and

    f.  That the City will not receive any reimbursement for any portion of the SEP from any
other person.

74.    **SEP Completion Report.**  Within ninety (90) Days after the date set for completion of
the SEP as set forth in **Appendix F** of this Consent Decree, the City shall submit a SEP
Completion Report to the EPA for review and approval in accordance with Section IX
("Deliverables and Review Process").  The SEP Completion Report shall contain all of the
following information:

    a.  A detailed description of the SEP as implemented;

b. A description of any problems encountered in completing the SEP and the solutions thereto;

c. An itemized list of all eligible SEP costs expended;

d. Certification that the SEP has been fully implemented pursuant to the provisions of this Consent Decree; and

e. A description of the environmental and public health benefits resulting from implementation of the SEP (with a quantification of the benefits and pollutant reductions, if feasible).

75. EPA may, in its sole discretion, require information in addition to that described in the preceding Paragraph, in order to evaluate the City's SEP Completion Report.

76. After receiving the SEP Completion Report, EPA shall notify the City whether or not the City has satisfactorily completed the SEP. If the City has not completed the SEP in accordance with this Consent Decree, stipulated penalties may be assessed under Section XII of this Consent Decree ("Stipulated Penalties").

77. **Dispute Resolution**: Disputes concerning the satisfactory performance of the SEP and the amount of eligible SEP costs may be resolved under Section XIV of this Consent Decree ("Dispute Resolution"). No other disputes arising under this Section shall be subject to Dispute Resolution.

78. **Public Statements**: Any public statement, oral or written, in print, film, or other media, made by the City making reference to the SEP under this Consent Decree shall include the following language: "This project was undertaken in connection with the settlement of an

68

enforcement action, *United States et al. v. City of Ft. Smith*, (C.A. No. ___, W.D. Ark.), taken on behalf of the U.S. Environmental Protection Agency under the Clean Water Act."

## IX.   DELIVERABLES AND REVIEW PROCESS

79.   As set forth in this Section, and as summarized in the last two columns of **Appendix G** ("Table of Deliverables and Due Dates"), certain Deliverables under this Consent Decree are subject to EPA review and approval, and other Deliverables are subject to EPA review and comment. EPA shall use its best efforts to expeditiously review and approve or review and comment on Deliverables from the Date of Lodging. In the event of a conflict between the provisions of Section V and the provisions in Paragraphs 80-89 and Appendix G, the provisions of Section V shall control.

80.   **List of Deliverables Subject to Review and Approval**:

    a.   The Plan for Additional Remedial Measures to be constructed in Basin 12 (Article Two);

    b.   The Remedial Measures Plans resulting from SSA activities conducted in each Calendar Year, as contained in each Annual Report (Article Two);

    c.   The Remedial Measures Plan(s) resulting from the Pump Stations and Force Mains Evaluation Report(s) (Article Three);

    d.   Capacity Remedial Measures Plan (Article Five);

    e.   Each of the City's plans for the CMOM Program components (Article Seven); and

    f.   Final SEP Completion Report (Section VII and **Appendix F**).

81.   **List of Deliverables Subject to Review and Comment**:

a.  The SSA reports, as contained in each Annual Report (Article One));

b.  The PS/FM Report (Article Three);

c.  Pump Station Alternative Power Supply Completion Confirmation Documentation (Article Three);

d.  Capacity Assessment Report (Article Four);

e.  Hydraulic Model Update Report (Article Four);

f.  CMOM – SOPs for the operation and maintenance of all WCTS components (Article Seven);

g.  CMOM – FOG Program Reporting in each Annual Report (Article Seven);

h.  CMOM – Root Control Program Reporting in each Annual Report (Article Seven);

i.  CMOM – Cleaning Program Reporting in each Annual Report (Article Seven);

j.  CMOM – Continuing Sewer System Assessment ("CSSA") Program in each Annual Report (Article Seven);

k.  CMOM – Continuing Pump Station and Force Main Evaluation and Maintenance Program in each Annual Report (Article Seven);

l.  CMOM – Continuing Capacity Assurance ("CCA") Program in each Annual Report (Article Seven);

m.  CMOM – SSO Reporting in each Annual Report (Article Seven);

n.  CMOM - Overflow Emergency Response Plan ("OERP") Reporting in each Annual Report (Article Seven);

o.  CMOM – Comprehensive Training Program in Annual Report (Article Seven);

    p.  Mitigation Program Requirement Report (Section VI);

    q.  SEP Escrow Agreement (**Appendix F**); and

    r.  The Assessment and Remediation Plan for Effluent Limit Exceedances at the Massard WWTP and the P Street WWTP (Article Eight).

82.    **Procedure for Deliverables Subject to Review and Approval**: After review of any Deliverable that is required to be approved under Paragraph 80, EPA, after consultation with the State, shall in writing: (1) approve the submission; (2) approve the submission upon specified conditions; (3) approve part of the submission and disapprove the remainder; or (4) disapprove the submission.

83.    If the Deliverable is fully approved with no conditions, City shall take all actions required by the Deliverable, in accordance with the schedules and requirements as approved. If the Deliverable is conditionally approved or approved only in part, City shall, upon written direction from EPA, after consultation with the State, take all actions required by the approved portions of the Deliverable that EPA determines are technically severable from any disapproved portions, subject to City's right to dispute only the specified conditions or the disapproved portions, under Section XIV of this Decree ("Dispute Resolution").

84.    If the Deliverable is disapproved in whole or in part, City shall, within thirty (30) Days or such other time as EPA agrees to in writing, correct all deficiencies and resubmit for approval the Deliverable, in accordance with this Section IX ("Deliverables and Review Process").

85.    For any Deliverable that is disapproved in whole or in part, EPA shall provide a written explanation of how the Deliverable does not meet the requirements of the Consent Decree. If the

resubmission is approved in whole or in part, City shall proceed in accordance with Paragraph 83 or 84, as appropriate.

86.     If a resubmitted Deliverable, or portion thereof, is disapproved in whole or in part, EPA, after consultation with the State, may again require City to correct any deficiencies, in accordance with this Section IX ("Deliverables and Review Process"), or may itself, after consultation with the State, correct any deficiencies, subject to City's right to invoke Dispute Resolution and the right of EPA to seek stipulated penalties under Section XII ("Stipulated Penalties") of this Consent Decree.

87.     All Deliverables required to be submitted for review and approval shall, upon approval or modification by EPA, be enforceable under this Consent Decree.  In the event EPA, after consultation with ADEQ, approves or modifies a portion of such a Deliverable, the approved or modified portion shall be enforceable under this Consent Decree subject to the City's right to invoke dispute resolution under Section XIV of this Decree ("Dispute Resolution").

88.     **Procedure for Deliverables Subject to EPA Review and Comment.**  For Deliverables subject to EPA review and comment, as listed in Paragraph 81, EPA, in its discretion, may or may not provide comments.  If EPA provides comments that identify deficiencies in a Deliverable, and EPA specifically requests a response from City, then City shall provide a written response to EPA within thirty (30) Days of receipt of such comments or within such time as EPA and City agree to in writing.  If City fails to substantively address EPA's comments when EPA specifically requests a response, such failure is subject to Stipulated Penalties under

72

Section XII, Paragraph 103and the Dispute Resolution provisions under Section XIV of this Decree.

89.     All Deliverables shall be submitted to EPA and ADEQ in electronic and searchable text format, unless otherwise directed by EPA in writing.  Each Deliverable shall be certified in accordance with Section XVII of this Consent Decree.  City shall maintain copies of all Deliverables in accordance with Section XV ("Information Collection and Retention").

## X.     REPORTING

90.     City shall prepare and submit to EPA and ADEQ in accordance with Section XX ("Notices") an Annual Report documenting its Consent Decree compliance activities for each Calendar Year.  The first Annual Report shall be submitted no later than March 31, 2016 and shall cover the time period between the Date of Lodging and December 31, 2015.  Thereafter, Annual Reports shall cover the full Calendar Year from January 1st through December 31st and shall be submitted no later than March 31st of the following year.  As explained in Section IX ("Deliverables and Review Process"), City shall submit certain Deliverables as part of its Annual Reports, and such Deliverables shall be subject to EPA review and approval, after consultation with ADEQ, or EPA review and comment as indicated in Section IX ("Deliverables and Review Process").  In addition, certain Deliverables are also subject to the requirements contained in Section XI ("Certification, Approval and Seal by Professional Engineer") of this Decree.  Each Annual Report shall provide narratives, analyses, calculations, exhibits, legible maps, and other supporting information necessary to document the various WCTS investigations, WCTS analyses, maintenance activities, and remediation activities that the City undertook to achieve the

73

Objectives of this Consent Decree as stated in Section II. In the event of a conflict between the provisions in Paragraphs 90-97 and **Appendix G**, the provisions of Paragraphs 90-97 shall control.

91.      Regarding City's progress toward completing SSA activities required under Section V, Article One of this Consent Decree, each Annual Report shall:

   a.  Document all Basins and Sub-basins in which SSA activities were completed in the Annual Report Year;

   b.  Provide the number of miles of Gravity Sewer Lines in which SSA activities were completed in the Annual Report Year, and the total number of manholes in which SSA activities were completed in the Annual Report Year. While reporting the number of assessed manholes, City shall also report number of manhole(s) within the area of study that could not be located, if any, which may need additional time and effort to assess. Additionally, City shall provide the running total of gravity sewer lines and manholes assessed since the Date of Lodging;

   c.  State whether City performed SSA activities in accordance with **Appendix A** ("SSA Process") on at least forty (40) miles of Gravity Sewer Line; in the WCTS in the Annual Report Year. If the answer is "no," explain why the 40-mile target was not achieved;

   d.  For the Annual Report for Calendar Year 2017, state whether City performed SSA activities in accordance with **Appendix A** ("SSA Process") on at least one hundred

and fifty (150) miles of Gravity Sewer Line in the WCTS since the Date of Lodging.
If the answer is "no," explain why the 150-mile target was not achieved;

e. For the Annual Report for Calendar Year 2020, state whether City performed SSA
activities in accordance with **Appendix A** on at least three hundred (300) miles of
Gravity Sewer Line in the WCTS since the Date of Lodging. If the answer is "no,"
explain why the 300-mile target was not achieved;

f. State whether, in the Annual Report Year, City added to its WCTS by acquiring
ownership or operational control of any other Gravity Sewer Lines that were not part
of its WCTS in the preceding Calendar Year. If "yes," provide the footage of Gravity
Sewer Lines acquired, and a map depicting the service area where the new lines are
located; and

g. Document the SSA activities performed in the Annual Report Year including, but not
limited to:

   i. A Tabulation of flow monitoring performed in each Basin and Sub-basin, and
   the estimated pre-remediation peak wet-weather flow rate and measured dry-
   weather flow rate in each such Basin and Sub-basin. The City shall also
   include a legible Basin/Sub-basin map displaying flow monitoring and rainfall
   measurement locations;

   ii. A Tabulation of the total number of feet of Small Diameter and Large
   Diameter Gravity Sewer Lines examined via CCTV. Documentation shall
   include CCTV performed in each Basin and Sub-basin. Documentation shall

75

include the total number of feet of Gravity Sewer Lines examined via CCTV in the Annual Report Year and the running total since Date of Lodging;

iii.   A Tabulation of the total number of feet of smoke-testing performed in each Basin and Sub-basin. Documentation shall include the total number of feet of Gravity Sewer Lines smoke-tested in the Annual Report Year and the running total since Date of Lodging;

iv.   A Tabulation of the total number of feet and/or locations where dyed water flooding was performed in the Annual Report Year;

v.   A Tabulation of other Gravity Sewer Line investigations performed in the Annual Report Year;

vi.   A Tabulation of the Pipe Segments identified as receiving storm water discharges from Private Property including downspouts and area storm drains during the Annual Report Year;

vii.   A Tabulation of Direct Discharges from the WCTS discovered, if any, in the Annual Report Year, the specific locations of these Direct Discharges, and the Remedial Measures implemented to eliminate these Direct Discharges;

viii.   A Tabulation of the Private Service Line defects identified in the Calendar Year; and

ix.   A legible map showing the annual progress of SSAs by Sub-basin. This map shall depict, by different symbols, colors or other demarcations: (1) those Sub-basins in which SSAs were completed in the Annual Report Year; (2) those

76

Sub-basins in which SSAs were in progress in the Annual Report Year; and

(3) all of the Sub-basins in which SSAs were completed in all prior Years

from the Date of Lodging through December 31st of Year preceding the

Annual Report Year.

92.     Regarding the WCTS condition Remedial Measures required under Section V, Article

Two of this Consent Decree, each Annual Report shall include:

a.  The condition rating scores in accordance with NASSCO condition rating systems (as

set forth in **Appendix A**) for all Pipe Segments and all manholes assessed in the

Annual Report Year;

b.  The condition Remedial Measures projects identified under Section V, Article Two,

of this Consent Decree for which construction was initiated in the Annual Report

Year, including the schedules for completing those projects;

c.  The condition Remedial Measures projects identified through Section V, Article Two

of this Consent Decree for which construction was completed in the Annual Report

Year; and

d.  A legible map showing the annual progress of completion of condition Remedial

Measures by Sub-basin. This map shall depict, by different symbols, colors or other

demarcations: (1) those Sub-basins in which Remedial Measures were completed in

the Annual Report Year; (2) those Sub-basins in which Remedial Measures were in

progress in the Annual Report Year; and, (3) all of the Sub-basins in which Remedial

77

Measures were completed in all prior Years from the Date of Lodging through December 31st of Year preceding the Annual Report Year.

93.     For the Remedial Measures projects presented in **Appendix E1** ("Previously Identified Capacity–Related Remedial Measures Projects Already Budgeted") and **Appendix E2** ("Other Previously Identified Capacity-Related Remedial Measures Projects"), and any new capacity Remedial Measures projects arising from Article Four ("Capacity Assessment and Hydraulic Modeling") and Article Five ("Capacity Remedial Measures"), each Annual Report shall include:

   a. The capacity Remedial Measures identified in **Appendix E1, Appendix E2,** or in the Capacity Remedial Measures Plan developed under Article Five ("Capacity Remedial Measures Plan"), for which construction was initiated in the Annual Report Year, including the anticipated schedules for completing those projects;

   b. The Remedial Measures projects identified in **Appendix E1, Appendix E2,** or in the Capacity Remedial Measures Plan developed under Article Five ("Capacity Remedial Measures Plan"), for which construction was completed in the Annual Report Year; and

   c. A legible map showing the annual progress of completion of capacity Remedial Measures by Sub-basin.  This map shall depict, by different symbols, colors or other demarcations: (1) those Sub-basins in which Remedial Measures were completed in the Annual Report Year; and (2) all of the Sub-basins in which Remedial Measures

were completed in all prior Years from the Date of Lodging through December 31st of the Year preceding the Annual Report Year.

94.    For the CMOM activities described under Section V, Article Seven ("Development of a Capacity, Management, Operation and Maintenance Program") of this Consent Decree, each Annual Report shall document:

    a.  The FOG Control Program required under Article Seven, Paragraph 37 including, but not limited to:

        i.   Changes made in the Annual Report Year, if any, to City ordinances to implement the FOG Control Program in the approved CMOM Program;

        ii.  List of FOG Generators operating in the Annual Report Year;

        iii. Tabulation of FOG Control Device inspections performed in the Annual Report Year including the dates of inspections;

        iv.  Tabulation of FOG Control Program violations that occurred in the Annual Report Year, enforcement actions taken to resolve those violations, and correlations, if any, between those violations and WCTS blockages that occurred in the Annual Report Year due primarily to FOG build-ups; and

        v.   Status report on the performance indicators selected by City to track the effectiveness of the FOG Control Program.

    b.  The Root Control Program activities required under Article Seven, Paragraph 39, including, but not limited to:

        i.   Pipe Segments receiving reactive root removal in the Annual Report Year;

79

    ii.  Pipe Segments receiving proactive root control in the Annual Report Year;

    iii.  A Tabulation of notifications sent to property owners regarding potential root intrusion into their Private Service Lines discovered in the Annual Report Year; and

    iv.  A Tabulation of follow-ups, including enforcement actions, on notifications sent to property owners regarding potential root intrusion into their Private Service Lines discovered in prior Calendar Years.

c.  The Gravity Sewer Line Cleaning Program activities required under Article Seven, Paragraph 41, including, but not limited to:

    i.  Total footage of Gravity Sewer Lines cleaned as part of the CMOM targeted cleaning program in the Annual Report Year. Documentation shall include a legible WCTS map displaying the Pipe Segments where targeted cleaning was performed and the frequencies of cleaning;

    ii.  Total footage of Small-Diameter Gravity Sewer Lines cleaned as part of the CMOM system-wide cleaning program in the Annual Report Year. Documentation shall include a legible WCTS map displaying the Pipe Segments cleaned as part of the CMOM system-wide cleaning program in Calendar Years prior to the Annual Report Year to a maximum of seven (7) prior Calendar Years;

    iii.  A calculation of the percentage of Small-Diameter Gravity Sewer Lines cleaned in the Annual Reporting Year, to determine whether compliance with

the ten (10) percent minimum per year requirement in Subparagraph 41.b. has or has not been met also taking into consideration "banking";

iv.   Total footage of Large-Diameter Gravity Sewer Lines cleaned as part of the CMOM system-wide cleaning program in the Annual Report Year;

v.   For the Annual Report for the Year 2018, a calculation of the percentage of Large Diameter Gravity Sewer Lines cleaned in the Annual Reporting Year, to determine whether compliance with the eight (8) miles of Large-Diameter Gravity Sewer Line cleaning requirement from Date of Lodging through December 31, 2018, in Subparagraph 41.c. has or has not been met;

vi.   For the Annual Report for the Year 2021, a calculation of the percentage of Large-Diameter Gravity Sewer Lines cleaned in the Annual Reporting Year, to determine whether compliance with the sixteen (16) miles of Large-Diameter Gravity Sewer Line cleaning requirement from Date of Lodging through December 31, 2021, in Subparagraph 41.c. has or has not been met; and

vii.   For the Annual Report for the Year 2024, a calculation of the percentage of Large-Diameter Gravity Sewer Lines cleaned in the Annual Reporting Year, to determine whether compliance with the requirement to complete cleaning of all remaining miles of Large-Diameter Gravity Sewer Line from Date of Lodging through December 31, 2024, in Subparagraph 41.c. has or has not been met.

d. The WCTS CSSA Program activities required under Article Seven, Paragraph 43 including, but not limited to:

    i. A Tabulation of the total feet of Gravity Sewer Lines examined via CCTV in the Annual Report Year as part of the CSSA Program. Documentation shall include the condition ratings of the Pipe Segments examined via CCTV, based upon the NASSCO condition rating system (as set forth in **Appendix A**); the Remedial Measures determined to be required to achieve the Objectives of this Consent Decree as stated in Section II based upon those ratings; and the schedule for implementing those Remedial Measures;

    ii. A Tabulation of the manholes inspected in the Annual Report Year as part of the CSSA Program. Documentation shall include the condition ratings of the manholes inspected, based upon the NASSCO condition rating system (as set forth in **Appendix A**); the Remedial Measures determined to be required to achieve the Objectives of this Consent Decree as stated in Section II based upon those ratings; and the schedule for implementing those Remedial Measures; and

    iii. A Tabulation of Gravity Sewer Line and manhole Remedial Measures identified through the CSSA Program effort that were completed in the Annual Report Year.

82

e.  A narrative describing the Continuing Pump Station and Force Main Evaluation and Preventive Maintenance activities required under Article Seven, Paragraph 45 including, but not limited to:

   i.  The findings of Pump Station and Force Main evaluations conducted in the Annual Report Year, including condition, configuration and capacity deficiencies discovered;

   ii.  Pump Station and Force Main Remedial Measures required to achieve the Objectives of this Consent Decree as stated in Section II, and the schedule for completing those Remedial Measures; and

   iii.  A Tabulation of Pump Station and Force Main Remedial Measures identified through the Continuing Pump Station and Force Main evaluation effort that were initiated or completed in the Annual Report Year.

f.  Continuing Capacity Assurance Program activities required under Article Seven, Paragraph 46 including, but not limited to:

   i.  The findings of Continuing Capacity Assurance activities conducted in the Annual Report Year, if any, including modifications to City's Hydraulic Model;

   ii.  The future WCTS service area population used for modeling, and the average and peak dry-weather flow rates associated with that population;

   iii.  Additional capacity Remedial Measures required to achieve the Objectives of this Consent Decree as stated in Section II; and

83

    iv. A Tabulation of capacity Remedial Measures identified through the Continuing Capacity Assurance Program efforts that were initiated or completed in the Annual Report Year;

g.  A Tabulation of SSOs (including Building/Private Property Backups) occurring in the Annual Report Year as required under Paragraph 47. including, but not limited to:

    i.  The location of each SSO by street address, asset identification number or any other appropriate method, such as latitude and longitude;

    ii.  Name of the receiving water, if any;

    iii.  Date and start/stop time of the SSO. In providing the date and start time, City should use the date and time when City first learned that the SSO was or might be occurring, and for stop time, City should use the known date and time (if available) or estimated date and time (if date and time not available).

    iv.  Estimate of the volume (in gallons) of wastewater released. City shall use the start/stop dates and times provided for Subparagraph 94.g.iii. above in calculating the estimate(s);

    v.  Identification of the WCTS component from which the SSO was released, such as, but not limited to, a manhole, a Gravity Sewer Line break, a Pump Station wet well, and/or a Force Main break;

    vi.  An explanation of the potential impact of the SSOs, if any, on public health and/or water quality in the receiving water body;

    vii.  Cause(s) or suspected cause(s) of the SSO;

84

    viii. Steps taken to respond to the SSO;

    ix. Steps taken to reduce, eliminate, and/or prevent recurrence of the SSO, including WCTS investigations;

    x. Copies of all SSO notifications sent to the public or other agencies or departments, as warranted; and

    xi. If an SSO or Private Service Line Release ("PSLR") is a Recurring SSO or Recurring PSLR, the following additional information shall be reported:

        1. The dates within the previous three (3) Calendar Years that other SSOs or PSLRs occurred at this location;

        2. The previous steps taken, if any, to reduce, eliminate, and/or prevent a recurrence of SSOs or PSLRs at this location; and

        3. The additional steps that City shall take to eliminate future SSOs or PSLRs from this location.

h. IMS development completed in the Annual Report Year as required under Article Seven, Paragraph 50;

i. A description of all OERP activities required under Article Seven, Paragraph 48 made in the Annual Report Year, if any;

j. Copies of SOPs for operation and maintenance of the WCTS required under Article Seven, Paragraph 53;

k. A Tabulation of Private Service Line Defect Remediation Program activities required under Article Seven, Paragraph 54, including: (1) a Tabulation, including the property

address, of the locations where Private Service Line defects were identified through CSSA activities or otherwise become known to City in the Annual Report Year; (2) a Tabulation of the locations, including the property address, where Private Service Line defect remediation was completed in the Calendar Year; and (3) a Tabulation, by property address, of the locations where Private Service Line defects were identified in prior Years, but where defect remediation has not yet been completed;

l.   A Tabulation of employee training activities required under Article Seven, Paragraph 55 conducted in the Annual Report Year including, but not limited to:

    i.   Category of Utility Department employees directly or indirectly involved in the operation and maintenance of the WCTS; and

    ii.   Specific training received by each category of Utility Department employee in prior Calendar Years and received in the Annual Report Year; and

m.   A narrative of CMOM activities required under Article Seven, Paragraph 56 regarding the WCTS spare parts Inventory Management System performed in the Annual Report Year.

95.    For the Supplemental Environmental Project ("SEP") described under Section VIII and **Appendix F** of this Consent Decree, each Annual Report shall include the required information regarding the SEP implementation, as set forth in Section D, Subparagraph 3 of **Appendix F** ("Reporting Schedule").

96.    Fort Smith may revise the form and format of reporting forms required to be submitted for CMOM Program activities without EPA's approval, provided that there is no deletion of any

information required to be submitted under Section V, Article Seven ("Development of a Capacity, Operation, Management and Maintenance Program"). Fort Smith shall provide sample copies of any revised reporting forms to EPA and ADEQ not less than sixty (60) Days prior to the date that Fort Smith intends to place these revised forms into general use.

97.    City shall not object to the authenticity and admissibility into evidence of any Deliverable prepared by the City in accordance with this Consent Decree or the information contained in said Deliverables in any proceeding to enforce this Consent Decree.

## XI.    CERTIFICATION, APPROVAL, AND SEAL BY A PROFESSIONAL ENGINEER

98.    City shall provide a summary report and certification, approval, and seal, by a lead Professional Engineer licensed by the Arkansas State Board of Licensure for Professional Engineers and Professional Surveyors for the following Consent Decree Deliverables:

   a.  Section V, Article Two – Remedial Measures Plan resulting from SSA activities conducted in the first Calendar Year following Date of Lodging;

   b.  Section V, Article Three – Pump Station and Force Main Evaluation Report and Remedial Measures Plan;

   c.  Section V, Article Four – Capacity Assessment Report; and

   d.  Section IX – the first year Annual Report (required to document compliance activities in the first Annual Report Year).

99.    Each summary report prepared by a Professional Engineer shall document City's activities for the relevant Deliverable listed under Paragraph 98 and shall certify whether City has complied with the provisions of this Consent Decree for that Deliverable. In the summary of

87

City's activities, the Professional Engineer shall identify those activities which were in compliance with provisions of this Consent Decree and those activities that were not in compliance, if any.

100. The certification language for such Deliverables shall read as follows: "I certify, approve, and seal the following documents and all attachments thereto, in accordance with, and under penalty of, Arkansas State law and federal law as a licensed engineer in the State of Arkansas."

101. City shall bear all costs associated with the retaining of a Professional Engineer, if needed. If an outside Professional Engineer is retained, City shall provide the Professional Engineer with access to all records, employees, Consultants and Contractors, and facilities that the Professional Engineer deems reasonably necessary to effectively perform its duties.

## XII. STIPULATED PENALTIES

102. City shall be liable for stipulated penalties to the United States for violations of this Consent Decree, upon demand. Stipulated penalties due and owing under this Section shall be paid in the manner specified in Paragraphs 118-119. Stipulated penalties for which a demand has been made shall be paid unless excused under Section XIII (Force Majeure), or by the terms of this Section.

103. **Failure to Submit Timely and/or Complete Deliverables.** City shall pay to the United States stipulated penalties, as set forth below, for each day City fails to submit and/or complete any Deliverables required under this Consent Decree by the specified due dates or to make any required changes to those documents to address EPA comments within the required time frames. If a due date falls on a holiday or weekend, the due date shall be the following business day.

88

With the exception of the Annual Reports required under Section X (Reporting), the stipulated penalties for failure to meet each Deliverable submission date shall be as follows:

| Period of Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st to 30th day | $500 |
| 31st to 60th day | $1,250 |
| 61st day and beyond | $2,000 |

104.   Regarding Annual Reports, due on March 31st of the Year following the Calendar Year in question, the following shall be the stipulated penalty for failing timely to submit an Annual Report:

| Period of Noncompliance | Penalty per Day for Delinquent Report |
|---|---|
| 1st to 30th day | $2,000 |
| 31st to 60th day | $6,000 |
| 61st day and beyond | $12,000 |

105.   If City fails timely to submit any Annual Report, the stipulated penalties for late Annual Reports set forth in Paragraph 104 shall apply. If City timely submits an Annual Report, but that Annual Report is missing any one or more of the Deliverables required by this Consent Decree to appear in Annual Reports, then a stipulated penalty shall be due, on demand, for each Deliverable missing from that Annual Report, in accordance with the stipulated penalties first set forth in Paragraph 104.

106.   **Failure to Meet Deadline for Completion of Remedial Requirements**. Except as provided in Paragraph 107 below, City shall pay to the United States stipulated penalties as set

forth below for each day City fails to meet a deadline for completing any of the remedial requirements of Section V or **Appendix E1** or **E2** of this Consent Decree, subject to the opportunity to revise the **Appendix E2** dates in the Capacity Remedial Measures Plan, provided that none of the dates are later than twelve (12) Years from the Date of Lodging. (See Section V, Article Six). If City modifies the completion dates for any **Appendix E2** projects, the revised dates shall be enforceable and subject to the stipulated penalties in this Paragraph 106. The stipulated penalties for failure to meet each such requirement shall be as follows:

| Period of Noncompliance | Penalty per Violation per Day |
| --- | --- |
| 1st to 30th day | $750 |
| 31st to 60th day | $1,500 |
| More than 60 days | $3,000 |

107. **Failing to Meet the Mileage Targets for Completing SSA Activities on Gravity Sewer Lines (and incorporated manholes) in accordance with Section V, Article One, Paragraph 10.** City shall pay to the United States stipulated penalties as set forth below for each day: (1) beyond three (3) Years from the Date of Lodging that it takes for City to complete SSAs on one hundred and fifty (150) unique miles of Gravity Sewer Lines; (2) beyond six (6) Years from the Date of Lodging that it takes for City to complete SSAs on three hundred (300) unique miles of Gravity Sewer Lines; and (3) beyond eight (8) Years from the Date of Lodging that it takes for City to complete SSAs on all Gravity Sewer Lines listed in the last column of **Appendix C**, all in accordance with Section V, Article One, Paragraphs 10-16, and the SSA Process set out in **Appendix A.**

90

| Period of Noncompliance | Penalty per Violation per Day |
|---|---|
| 1st to 30th day | $1,000 |
| 31st to 60th day | $2,000 |
| More than 60 days | $3,500 |

108. **SSOs that Reach Waters of the United States or Waters of the State of Arkansas.**

For each SSO that reaches Waters of the United States or Waters of the State, Fort Smith shall be liable to pay a stipulated penalty as follows:

| If SSO occurs in | Penalty Per Violation, Per Day |
|---|---|
| Calendar Years 2015-2020 | $500 |
| Calendar Years 2021-2025 | $1,500 |
| Calendar Years 2026 and Beyond | $3,000 |

Note: If the United States has concluded that an SSO did not reach Waters of the United States, the United States shall consult with the State of Arkansas to determine whether such SSO reached Waters of the State before issuing a demand for stipulated penalties for such SSO. If the State determines that such SSO reached Waters of the State, Fort Smith shall be liable for stipulated penalties pursuant to this Paragraph 108 of this Consent Decree. SSOs that do not reach Waters of the United States or Waters of the State shall be subject to Paragraph 109 of this Consent Decree.

109. **SSOs that Do Not Reach Waters of the United States or Waters of the State of Arkansas.** For each SSO that does not reach either waters of the United States or Waters of the State of Arkansas, Fort Smith shall be liable to pay a stipulated penalty as follows:

| If SSO occurs in | Penalty Per Violation, Per Day |
|---|---|
| Calendar Years 2015-2020 | $350 |
| Calendar Years 2021-2025 | $750 |
| Calendar Years 2026 and Beyond | $1,500 |

110.    **Failure to Timely and/or Completely Report SSOs**.  City shall pay the following

stipulated penalty for failing to timely and/or completely report an SSO in accordance with

Paragraph 47.

Penalty Per SSO                  $2,000

111.    **Exceeding Effluent Limitations Set in City's NPDES Permits for the P Street**

**WWTP and/or the Massard WWTP.**  City shall pay the following stipulated penalty for

exceeding an effluent limit in its NPDES Permit for the P Street WWTP and/or the Massard

WWTP, as set forth in the permits in effect at the Date of Lodging:

| Weekly Effluent Limits | Penalty per Violation per Week | $1,000 |
|---|---|---|
| Monthly Effluent Limits | Penalty per Violation per Month | $1,000 |

Note: Each effluent limit for each parameter is counted as a separate violation, such that the

monthly effluent for milligrams per liter of suspended solids, and monthly effluent for pounds

per day of suspended solids are counted as two effluent limits.  Likewise, the weekly effluent

limit in pounds per day of CBOD5, and the monthly effluent limit in pounds per day of CBOD5

are counted as two separate effluent limits, and so forth.

92

112.    **Failure to Timely Meet SEP Requirements.** City shall pay the following stipulated

penalty for failure to timely meet SEP requirements as set forth in Section VIII and **Appendix F:**

| Period of Noncompliance | Penalty Per Violation, Per Day |
|---|---|
| 1st to 30th day | $500 |
| 31st to 60th day | $1,000 |
| More than 60 days | $2,000 |

113.    **Delay in Payment of Civil Penalty.** Fort Smith shall pay to the United States $1,000

per day for each Day that it is late in paying the civil penalty required by Section VII of this

Decree.

114.    For any other violations of this Consent Decree not set forth in the preceding paragraphs

of this Section XII, the stipulated penalty shall be $300 per day, per violation.

115.    Stipulated penalties under this Section shall begin to accrue on the day after performance

is due or on the day a violation occurs, whichever is applicable, and shall continue to accrue until

performance is satisfactorily completed or until the violation ceases. Stipulated penalties shall

accrue simultaneously for separate violations of this Consent Decree. Subject to Paragraph 117,

City shall pay any stipulated penalty within thirty (30) Days of receiving a written demand from

the United States.

116.    The United States may, in the unreviewable exercise of its discretion, reduce or waive

stipulated penalties otherwise due it under this Consent Decree.

93

117.    Stipulated penalties shall continue to accrue during any Dispute Resolution, with Interest on accrued penalties payable and calculated at the rate established by the Secretary of the Treasury, pursuant to 28 U.S.C. § 1961, but need not be paid until the following:

      a.    If the dispute is resolved by agreement or by a decision of EPA that is not appealed to the Court, City shall pay accrued penalties determined to be owing, together with Interest, to the United States within thirty (30) Days of the effective date of the agreement or the receipt of EPA's/State's written decision or order;

      b.    If the dispute is appealed to the Court and the United States prevails in whole or in part, City shall pay all accrued penalties determined by the Court to be owing, together with interest, within sixty (60) Days of receiving the Court's decision or order, except as provided in Subparagraph 117.c.; and

      c.    If any Party appeals the District Court's decision, City shall pay all accrued penalties determined to be owing, together with Interest, within fifteen (15) Days of receiving the final non-appealable appellate court decision.

118.    Stipulated penalties owing to the United States shall, as directed by the United States, be paid by EFT in the amount due payable to the "U.S. Department of Justice," referencing DOJ No. 90-5-1-1-08677 and United States Attorney's Office file number [_____], and delivered to the office of the United States Attorney, Western District of Arkansas.

119.    If City fails to pay stipulated penalties according to the terms of this Consent Decree, City shall be liable for Interest on such penalties, as provided for in 28 U.S.C. § 1961, accruing as of the date payment became due.

120.    Subject to the provisions of Section XVIII of this Consent Decree ("Effect of

Settlement/Reservation of Rights"), the stipulated penalties provided for in this Consent Decree

shall be in addition to any other rights, remedies, or sanctions available to the United States for

City's violation of this Consent Decree or applicable law.  Where a violation of this Consent

Decree is also a violation of the Act, regulations promulgated under the Act or the Permits, City

shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties

imposed for such violation.

## XIII.    FORCE MAJEURE

121.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising

from causes beyond the control of City, its Contractors, Consultants or any entity controlled by

City that delays or prevents the performance of any obligation under this Consent Decree despite

City's best efforts to fulfill the obligation.  "Best efforts" include using best efforts to anticipate

any potential force majeure event and to address the effects of any such event (a) as it is

occurring and (b) after it has occurred, such that the delay is minimized to the greatest extent

possible.  "Force Majeure" does not include City's financial inability to perform any obligation

under this Consent Decree.

122.    City shall provide notice to the United States and to the State orally or by electronic or

facsimile transmission as soon as possible, but not later than five (5) business days after the time

City first knew of, or by the exercise of best efforts, should have known of, a claimed force

majeure event.  City shall also provide written notice, as provided in Section XX of this Consent

Decree ("Notices"), within fourteen (14) days of the time City first knew of, or by the exercise of

best efforts, should have known of, the event. The notice shall state the reason(s) for the delay, its anticipated duration, City's past and proposed actions to prevent or minimize any delay, a schedule for carrying out those actions, and City's rationale for attributing any delay to a force majeure event. Failure to give such notice shall preclude City from asserting any claim of force majeure. City shall be deemed to know of any circumstance of which City, its Consultants, Contractors, or any entity controlled by City knew or, through best efforts, should have known.

123.    If the United States after consultation with the State, agrees that a force majeure event has occurred, then it may agree to extend the time for City to perform the affected requirements for the time necessary to complete those obligations. An extension of time to perform the obligations affected by a force majeure event shall not, by itself, extend the time to perform any other obligation.

124.    If the United States, after consultation with the State, does not agree that a force majeure event has occurred or will occur, or does not agree to the extension of time sought by City, the United States' position shall be binding, unless City invokes Dispute Resolution under Section XIV of this Consent Decree. In any such dispute, City bears the burden of proving, by a preponderance of the evidence, that each claimed force majeure event is a force majeure event; that City gave the notice required by Paragraph 122; that the force majeure event caused any delay City claims was attributable to that event; and that City exercised best efforts to prevent or minimize any delay caused by the event.

## XIV.    DISPUTE RESOLUTION

125.    Unless otherwise expressly provided for in this Consent Decree, the dispute resolution
procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or
with respect to this Consent Decree.  However, such procedures shall not apply to actions by the
United States or the State to enforce obligations of City that have not been disputed in
accordance with this Section.

126.    **Informal Dispute Resolution.**  Any dispute which arises under or with respect to this
Consent Decree shall first be the subject of good-faith informal negotiations between the parties
to the dispute.  The goal of the informal negotiations shall be to resolve the dispute without
further proceedings.  The period for informal negotiations shall not exceed thirty (30) days from
the time the dispute arises, unless: (1) the United States, after consultation with the State, in its
sole discretion, determines that a shorter period shall be allowed due to an immediate threat to
the environment, or (2) all parties to the dispute agree in writing to an extension.  The dispute
shall be considered to have arisen when City sends the United States and the State a written
"Notice of Dispute."  The Notice of Dispute shall contain a concise statement of the issue or
issues in dispute.  If informal negotiations result in an agreement between the parties to the
dispute, then those parties shall state the agreement in a single document in writing.  If informal
negotiations do not result in an agreement between the parties to the dispute, then the United
States, after consultation with the State, shall provide to City in writing an opinion on the
disputed issue or issues.

97

127.   **Formal Dispute Resolution.**  City shall invoke formal dispute resolution procedures within thirty (30) Days after issuance and receipt of the United States written opinion on the dispute by serving on the United States and the State a written "Statement of Position" regarding the matter in dispute.  City's Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting its position and any supporting documentation on which it relies.

128.   The United States, after consultation with the State, shall serve its Statement of Position within thirty (30) Days after receipt of City's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be binding on City unless City files a motion for judicial review of the dispute in accordance with Paragraph 129.

129.   **Judicial Dispute Resolution.**  City may seek judicial review of the dispute by filing with the Court and serving on the United States and the State, in accordance with Section XX ("Notices") of this Consent Decree, a motion requesting judicial resolution of the dispute ("Judicial Dispute Resolution").  The motion must be filed within twenty (20) Business Days of receipt of the United States' Statement of Position pursuant to Paragraph 128.  The motion shall contain a written statement of City's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

130.    The United States, after consultation with the State, shall respond to City's motion within the time period allowed by the Local Rules of this Court.  City may file a reply memorandum, to the extent permitted by the Local Rules.

131.    **Standard of Review**

    a.  Except as otherwise provided in this Consent Decree, in any dispute brought under Paragraph 127("Formal Dispute Resolution") City shall have the burden of demonstrating, based on the administrative record, that its position complies with this Consent Decree and better furthers the Objectives of the Consent Decree; and

    b.  With regard to Judicial Dispute Resolution, the Parties reserve their rights to argue regarding the applicable standard of review to be followed by the court.

132.    The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of City under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute as provided in Section XII, Paragraph 117.  If City does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XII ("Stipulated Penalties")

## XV.    INFORMATION COLLECTION AND RETENTION

133.    The United States, the State, and their representatives, including attorneys, Contractors, and Consultants, shall have the right of entry to the POTWs and any part of the WCTS covered by this Consent Decree, at all reasonable times, upon presentation of credentials to:

    a.  Monitor the progress of activities required under this Consent Decree;

    b.  Verify any data or information submitted to the United States or the State in accordance with the terms of this Consent Decree;

    c.  Obtain samples and, upon request, splits of any samples taken by City or its representative, Contractors, or Consultants; and

    d.  Assess City's compliance with this Consent Decree.

134.    Upon request, the City shall allow split or duplicate samples to be taken by EPA and the State or their authorized representatives. Upon request, EPA and the State shall allow City to take split or duplicate samples of any samples they take.

135.    Until five (5) years after the termination of this Consent Decree, City shall retain, and shall instruct its Consultants, Contractors and agents to preserve, all non-identical copies of all records and documents (including records or documents in electronic form) now in its or its Consultants', Contractors' or agents' possession or control, or that come into its or its Consultants, Contractors' or agents' possession or control, and that relate in any manner to City's performance of its obligations under this Consent Decree. This record retention requirement shall apply regardless of any document-retention policy to the contrary.

136.    At the conclusion of the document-retention period provided in Paragraph 135, City shall notify the United States and the State at least ninety (90) days prior to the destruction of any records or documents subject to the requirements Paragraph 135, and, upon request by the United States or the State, City shall deliver any such records or documents to EPA or the State. City may assert that certain documents, records, or other information is privileged under the attorney-

client privilege or any other privilege recognized by federal law. If City asserts such a privilege, it shall provide the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege asserted by City. However, no documents, reports, or other information created or generated pursuant to the requirements of this Consent Decree shall be withheld on the grounds that they are privileged.

137.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States or the State, pursuant to applicable federal or state laws, regulations, or permits.

## XVI.    FAILURE OF COMPLIANCE

138.    The United States and the State do not, by consent to the entry of this Consent Decree, warrant or aver in any manner that City's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, regulations enacted pursuant to the Act, or applicable state laws and regulations. Notwithstanding the United States' or the State's review and approval of any documents submitted to it by City pursuant to this Consent Decree, City shall remain solely responsible for compliance with the terms of the Act and this Consent Decree. Application for construction grants, State Revolving Loan Funds, or any other grants or loans, or other delays caused by inadequate facility planning or plans and specifications on the part of City shall not be cause for extension of any required compliance date in this Consent Decree.

## XVII.    CERTIFICATION

139.    Except for the Deliverables listed in Section XI ("Certification, Approval and Seal by Professional Engineer") which are subject to that Section XI, in all other Deliverables, notices, documents or reports submitted to the United States and/or the State pursuant to this Consent Decree, Fort Smith shall, by a Fort Smith senior management official, sign and certify such Deliverables, notices, documents or reports as follows:

> "I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

This certification requirement does not apply to emergency or similar notifications where compliance would be impractical.

140.    City shall not object to the authenticity and admissibility into evidence of any Deliverable prepared by City in accordance with this Consent Decree, or the information contained in said Deliverables, in any proceeding to enforce this Consent Decree.

## XVIII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

141.    This Consent Decree resolves the civil claims of the United States and the State of Arkansas, against City for violations of the P Street Permit, Massard Permit, and Section 301 of

102

the Act, 33 U.S.C. § 1311, as alleged in the Complaint filed in this action, through the Date of Lodging.

142.   This Consent Decree supersedes all previously issued CWA administrative orders issued by EPA to City.

143.   City does not admit liability arising out of the transactions or occurrences alleged in the Complaint and reserves all rights regarding factual and legal contentions therein except in an action to enforce this Consent Decree by a Party.

144.   This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  City is responsible for achieving and maintaining complete compliance with all applicable federal, state, and local laws, regulations, and permits; and City's compliance with this Consent Decree shall be no defense to any action commenced pursuant to said laws, regulations, or permits.  Plaintiffs do not, by their consent to the entry of this Consent Decree, warrant or aver in any manner that City's compliance with any aspect of this Consent Decree will result in compliance with provisions of the Act, regulations, the NPDES Permits, or state law.

145.   This Consent Decree does not limit or affect the rights of City or of the United States or State against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties, not party to this Consent Decree, against City, except as otherwise provided by law.

146.   This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third-party not party to this Consent Decree.

147.   Nothing in this Consent Decree limits the rights or defenses available under Section

309(e) of the CWA, 33 U.S.C. § 1319(e), in the event that the laws of the State prevent Fort

Smith from raising the revenue needed to comply with this Decree.

## XIX.   COSTS

148.   The Parties shall each bear their own costs of litigation of this action, including attorneys'

fees, except that Plaintiffs shall be entitled to collect the costs (including attorney's fees)

incurred in any action necessary to collect any portion of the civil penalties or stipulated

penalties due but not paid by City.

## XX.   NOTICES

149.   Unless otherwise specified herein, whenever notifications, submissions, or

communications are required by this Consent Decree, they shall be made in writing and

addressed as follows:

To the United States:

    Chief, Environmental Enforcement Section
    Environment and Natural Resources Division
    U.S. Department of Justice
    Box 7611 Ben Franklin Station
    Washington, D.C.  20044-7611
    Re: DOJ No. 90-5-1-1-08677

    and

    Director, Compliance Assurance and Enforcement Division
    U.S. Environmental Protection Agency
    Region VI
    1445 Ross Avenue
    Mail Code (6EN)
    Dallas, Texas 75202

and

Deputy Regional Counsel, Enforcement
U.S. Environmental Protection Agency
Region VI
1445 Ross Avenue
Dallas, Texas 75202

To the State of Arkansas:

Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201

To the ADEQ:

Director
Arkansas Department of Environmental Quality
5301 Northshore Drive
North Little Rock, AR 72118-5317

To the City:

City Administrator
City of Fort Smith
P.O. Box 1908
Fort Smith, AR 72902-1908

Daily & Woods, P.L.L.C.
58 South 6th Street
P.O. Box 1446
Fort Smith, AR 72902-1446

Director of Utilities
City of Fort Smith
3900 Kelley Highway
Fort Smith, AR 72904

150.    Any party may, by providing written notice pursuant to this Section to the other Parties,

change its designated notice recipient or address listed herein.

151.   Notices submitted pursuant to this Section shall be deemed effective upon mailing, unless

otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.


## XXI.   EFFECTIVE DATE

152.   The Effective Date of this Consent Decree shall be the date upon which this Consent

Decree is entered by the Court.

## XXII.   RETENTION OF JURISDICTION

153.   The Court shall retain jurisdiction of this case until termination of this Consent Decree,

for the purpose of enabling any of the Parties to apply to the Court for such further order,

direction, or relief as may be necessary or appropriate for the construction or modification of this

Consent Decree, or to effectuate or enforce compliance with its terms, or to resolve disputes in

accordance with Section XIV of this Decree ("Dispute Resolution").

## XXIII.   MODIFICATION

154.   This Consent Decree, including Appendices, constitutes the entire agreement of the

Parties and shall not be modified by any prior oral or written agreement, representation or

understanding.  This Consent Decree may not be materially amended or modified except by

written agreement of the United States, the State of Arkansas and the City of Fort Smith, and

approval of this Court, after notice and motion to all Parties.  Any material modification of this

Consent Decree shall be effective upon approval of the Court.  Non-material modifications

which do not significantly alter the requirements of this Consent Decree may be made in writing

by mutual agreement of the United States, the State of Arkansas, and City, and shall be effective upon service.

155.    Any disputes, with the exception of disputes regarding the materiality of a modification, among the United States, the State and Fort Smith concerning modifications of this Consent Decree shall be resolved under Section XIV ("Dispute Resolution") of this Consent Decree, and the Party seeking modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

156.    Following the filing of any motion under Rule 60(b) seeking a material change to this Consent Decree, Stipulated Penalties shall accrue due to Fort Smith's failure, if any, to continue performance of obligations under this Consent Decree that are necessarily the subject of the Rule 60(b) motion; provided, however, that such penalties need not be paid if the Court resolves the motion in Fort Smith's favor.  Fort Smith shall comply with the Consent Decree as modified.

## XXIV.    TERMINATION

157.    This Consent Decree may be terminated when the United States, after consultation with the State, determines that City has completed performance of its compliance requirements under Section V of this Consent Decree, has thereafter maintained satisfactory compliance with this Consent Decree and its NPDES permits, and has paid the civil penalty under Section VII, and any accrued stipulated penalties as required under Section XII of this Consent Decree not waived or reduced by the United States.  City may serve on the United States a request for Termination, certifying that City has satisfied those requirements, together with all necessary supporting documentation ("Request for Termination").

158.    Following receipt by the United States and the State of City's Request for Termination, the Parties shall confer informally concerning the request and any disagreement that they may have as to whether City has complied with the requirements for termination of this Consent Decree. If the United States, after consultation with the State, agrees that the Decree may be terminated, the United States and Fort Smith shall submit, for the Court's approval, a joint stipulation terminating the Decree.

159.    If the United States, after consultation with the State, does not agree that the Decree may be terminated, Fort Smith may invoke Dispute Resolution under Section XIV of this Decree. However, Fort Smith shall not seek Dispute Resolution of any dispute regarding termination under of the Dispute Resolution Section, until one hundred and twenty (120) Days after service of its Request for Termination.

### XXV.    CONTINGENT LIABILITY OF THE STATE OF ARKANSAS

160.    Pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e), the United States specifically reserves its claims against the State of Arkansas, and the State of Arkansas reserves any and all defenses.

### XXVI.    PUBLIC PARTICIPATION

161.    This Consent Decree shall be lodged with the Court for a period of not less than thirty (30) days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate,

improper, or inadequate.  City consents to entry of this Consent Decree, as lodged, without further notice.

## XXVII.    SIGNATORIES/SERVICE

162.    Each undersigned representative of the City, the State of Arkansas, acting ex relation through the ADEQ, and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

163.    This Consent Decree may be signed in counterparts, and such counterpart signature pages shall be given full force and effect.

164.    City  hereby agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree, unless one or more Plaintiffs has notified City in writing that it no longer supports entry of the Decree.

165.    City hereby agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXVIII.    INTEGRATION/APPENDICES

166.    This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written.  No other document,

nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, nor shall it be used in construing the terms of this Decree.

167.    The following Appendices are attached to and incorporated into this Consent Decree:

**Appendix A** - The Sanitary Sewer Assessment ("SSA") Process

**Appendix B** -   Pump Station/ Force Main Evaluations

**Appendix C** - Sewer System Assessment ("SSA") Status

**Appendix D** - Remediation Determination Process

**Appendix E1** - Previously Identified Capacity-Related Remedial Measures Projects Already Budgeted

**Appendix E2** - Other Previously Identified Capacity-Related Remedial Measures Projects

**Appendix F** - Supplemental Environmental Project – Private Service Line Program

**Appendix G** – Fort Smith Consent Decree Deliverables and Associated Work Requirements

168.    Any conflict between the language in the body of the Consent Decree and the language in an appendix should be resolved in favor of the language in the body of the Decree.

## XXIX.  FINAL JUDGMENT

169.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall

constitute a final judgment between the United States, the State of Arkansas, acting ex relation

through the ADEQ, and the City.  The Court finds that there is no just reason for delay and

therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.


*P.K. Holmes us*

United States District Court Judge
for the Western District of Arkansas

DATED:   4-6-2015

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

FOR THE UNITED STATES OF AMERICA:

12/19/14
Date

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

12/30/14
Date

LISA A. CHERUP
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611 Ben Franklin Station
Washington, D.C.  20044-7611
Telephone (202) 514-2802
Lisa.Cherup@usdoj.gov

112

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

FOR PLAINTIFF THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:

12/23/2014
Date

JOHN BLEVINS
Division Director
Compliance Assurance and Enforcement Division
U.S. Environmental Protection Agency, Region VI
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

12/23/2014
Date

for SUZANNE MURRAY
REGIONAL COUNSEL
U.S. Environmental Protection Agency, Region VI
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

12/22/2014
Date

DAVID GILLESPIE
Assistant Regional Counsel
U.S. Environmental Protection Agency, Region VI
1445 Ross Avenue, Suite 1200
Dallas, Texas 75202-2733

113

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

12/19/14
Date

SUSAN SHINKMAN
Office Director
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

12-18-14
Date

MARK POLLINS
Division Director
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

12/18/14
Date

JOANNA CITRON DAY
Water Enforcement Division
Office of Civil Enforcement
Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW (2243A)
Washington, DC 20460

114

WE HEREBY CONSENT to the entry of this Consent Decree, subject to the public notice and comment provisions of 28 C.F.R. § 50.7:

FOR THE STATE OF ARKANSAS:


DATE: _12/18/14_


DUSTIN McDANIEL
Attorney General of Arkansas


DATE: _12/18/14_


KENDRA AKIN JONES
Senior Assistant Attorney General
323 Center Street, Suite 200
Little Rock, Arkansas 72201
Telephone (501) 682-7383

115

FOR DEFENDANT CITY OF FORT SMITH, ARKANSAS

December 18, 2014

Date

_Ray Gosack_

RAY GOSACK
City Administrator
City of Fort Smith
623 Garrison Avenue, Suite
P.O. Box 1908
Fort Smith, AR 72902


December 19, 2014

Date

_Jerry Canfield_

JERRY L. CANFIELD
City Attorney
Daily & Woods, P.L.L.C.
58 South 6th Street
P.O. Box 1446
Fort Smith, AR 72902

116

5

RESOLUTION NO. R-169-14

A RESOLUTION APPROVING AND AUTHORIZING EXECUTION AND DELIVERY FOR
FILING OF A PRECEDENT FOR A CONSENT DECREE IN LITIGATION BROUGHT
AGAINST THE CITY BY THE UNITED STATES OF AMERICA AND THE STATE OF
ARKANSAS

BE IT RESOLVED BY THE BOARD OF DIRECTORS OF THE CITY OF FORT
SMITH, ARKANSAS, that:

WHEREAS, it is anticipated that the United States of America and the State of Arkansas
will initiate litigation against the City of Fort Smith ("City") in the United States District Court
for the Western District of Arkansas, Fort Smith Division ("Court") asserting Clean Water Act
and other violations by the City; and

WHEREAS, through extensive negotiations, a precedent for a proposed Consent Decree
has been prepared for execution by the parties to the litigation and subsequent presentation for
approval to the Court;

NOW, THEREFORE:

SECTION 1:  The precedent for Consent Decree presented during this meeting and
attached hereto is hereby approved by the City of Fort Smith.

SECTION 2:  The City Administrator and the City Attorney are hereby authorized, on
behalf of the City of Fort Smith, to execute the precedent for the Consent Decree in substantially
the same form presented to this meeting and to deliver the executed precedent for filing with the
Court with a request for entry of the Consent Decree, subject to the public notice and comment
provisions of 28 C.F.R. § 50.7.

This Resolution adopted this _____16th_____ day of December, 2014.

APPROVED:

_____
Mayor

ATTEST:

_____
City Clerk

Approved as to form:

_____ NPR

**APPENDIX A**
<u>Sanitary Sewer Assessment ("SSA") Process</u>
Page 1 of 4



Flow Monitoring

*Basins with excessive infiltration*
*rates exceeding 5,000 gpd/idm*

Night Flow Isolation

**Manhole Inspections**
(All manholes in study area)

**Visual Pipe Inspection**

**Smoke Testing**
(All Pipe Segments in study area less
than 24" in diameter)

**Plastic Pipe**
(1995 or newer installation)

No Public Defects
Observed

**Public Defects**
**Observed**

No Public Defects
Observed

**Dye Testing**

CMOM

**CCTV**

See Page 2

**APPENDIX A**
<u>Sanitary Sewer Assessment ("SSA") Process</u>
Page 2 of 4



**APPENDIX A**
Sanitary Sewer Assessment ("SSA") Process
Page 3 of 4

| Plan, Schedule, and Conduct Sanitary System Assessments | | |
|---|---|---|
| **Small Diameter Gravity Sewer Mains (Less than 24" diameter)** | **Large Diameter Gravity Sewer Mains (Equal to or greater than 24" diameter)** | **Manholes** |
| **Select Inspection Methods**<br>– CCTV (all non-plastic pipe, plastic pipe older than 1995, and newer plastic pipe having defects revealed by other investigations)<br>– Visual inspection methods may include:<br>  ▪ Visual Pipe Segment inspection from full descent entry by trained field personnel<br>– Smoke testing<br>  ▪ Including concurrent visual inspection of buildings from the public ROW to attempt to ascertain the presence of downspouts and other private property storm drains<br>– Dye testing<br>– Other techniques (such as new technologies or methods that become available as preapproved by EPA)<br>– All other investigations the City deems necessary to locate sources of I/I that could cause or contribute to SSOs and/or condition defects in WCTS<br>**Prioritize pipes for inspection using these criteria:**<br><br>– The occurrence of dry-weather and wet-weather SSOs;<br>– The nature and extent of customer complaints;<br>– Previous and current flow monitoring studies;<br>– Location of SSOs in low-income census tract areas;<br>– The causes and applicable methods of eliminating SSOs;<br>– Remedial Measures already undertaken or scheduled for implementation;<br>– Field crew work orders; and,<br>– Other relevant information<br>–<br>**Schedule and conduct inspection activities**<br><br>– Generally, schedule CCTV after visual Pipe Segment and smoke testing inspection activities are complete. | **Inspection Methods**<br>– CCTV, sonar, 360 degree video, laser imaging, physical entry<br>– Other techniques (such as new technologies or methods that become available as preapproved by EPA)<br>– All other investigations the City deems necessary to locate sources of I/I that could cause or contribute to SSOs and/or condition defects in WCTS<br><br>**Select and prioritize pipes for inspection using these criteria:**<br>– The occurrence of dry-weather and wet-weather SSOs;<br>– The nature and extent of customer complaints;<br>– Previous and current flow monitoring studies;<br>– Location of SSOs in low-income census tract areas;<br>– The causes and applicable methods of eliminating SSOs;<br>– Remedial Measures already undertaken or scheduled for implementation;<br>– Field crew work orders; and,<br>– Other relevant information<br><br>**Schedule and conduct inspection activities** | **Inspection Methods**<br>– Full descent inspection with visual pipe inspection performed at same time.<br><br>– Other techniques (such as new technologies or methods that become available as preapproved by EPA)<br><br>**Schedule and conduct inspection activities**<br><br>– Generally manhole inspections are performed throughout the time frame to study a selected basin. |

| Gravity Sewer Line Condition Assessment | | |
|---|---|---|
| **Perform condition assessment based on these guidelines:**<br>– Prioritize the review of inspection data based on the severity of findings.<br>– Record defects utilizing PACP coding.<br>– Categorize assets based on the following table: | | |
| **Category** | **Example Structural Conditions for Each Category** | **Likely Outcome** |
| Grade 5 | Pipe segment has failed or will likely fail within the next five years.  Pipe segment requires immediate attention. | Remedial Design |
| Grade 4 | Pipe segment has severe defects with the risk of failure within the next five to ten years. | Remedial Design |
| Grade 3 | Pipe segment has moderate defects.  Deterioration may continue, but not for 10 to 20 years. | Add into CMOM program |
| Grade 2 | Pipe segment has minor defects.  Pipe is unlikely to fail for at least 20 years | Add into CMOM program |

| | | |
|---|---|---|
| Grade 1 | Pipe segment has minor defects.  Failure is unlikely in the foreseeable future. | Add into CMOM program |

Perform condition assessment on inspection data and consider appropriate criteria which shall include factors such as the following:
- Type and severity of structural defects
- Historical operation and maintenance data:  Overflows, inspections, cleaning findings, cleaning frequency, previous remediation, customer complaints, and other unique circumstances for each individual asset
- Site conditions:  Access for maintenance and construction, depth, soil type, environmental sensitivity, surface restoration requirements, and other unique circumstances for each individual asset

**APPENDIX A**
Sanitary Sewer Assessment ("SSA") Process
Page 4 of 4

| Manhole Condition Assessment | | |
|---|---|---|
| Perform condition assessment based on these guidelines: | | |
| – Prioritize the review of inspection data based on the severity of findings. | | |
| – Record Inflow/Infiltration defects, such as pick hole covers, frame seal leaks, infiltration runners, etc and assign estimated values of I/I for each Manhole. Each Manhole which is observed to have I/I defects are added to a remedial design project. | | |
| – Record MACP structural condition ratings for each component of the Manhole (cover and frame, frame adjustment, corbel, wall, bench, and trough) based on scoring conditions of 1 thru 5. Each Manhole component score is added and averaged. Any Manhole which has any component of 4 or 5, or whose average is above 4 is added to remedial list. | | |
| – Categorize assets based on the following table: | | |
| **Category** | **Example Structural Conditions for Each Category** | **Likely Outcome** |
| Grade 5 | Failure has already occurred or is likely to occur. | Remedial Design |
| Grade 4 | Cracks, deterioration, visible deformities observed. | Remedial Design |
| Grade 3 | Moderate corrosion observed and/or moderate surface damage to material. | Add into CMOM program |
| Grade 2 | Moderate material degradation noticed, however no visible structural defects. | Add into CMOM program |
| Grade 1 | New manhole with no defect observed. | Add into CMOM program |

Perform condition assessment on inspection data and consider appropriate criteria which shall include factors such as the following:
– Type and severity of structural defects
– Historical operation and maintenance data:  Overflows, inspections, cleaning findings, cleaning frequency, previous remediation, customer complaints, and other unique circumstances for each individual asset
– Site conditions: Access for maintenance and construction, depth, soil type, environmental sensitivity, surface restoration requirements, and other unique circumstances for each individual asset

APPENDIX B

Pump Station / Force Main Evaluations

Pump Stations

The City has designed and constructed improvements to replace five (5) of the seven (7) major Pump Stations serving the WCTS. Of these major Pump Stations, the City has completed construction of Pump Station 1 (P Street), Pump Station 3 (Massard), and Pump Station 4 (Sunnymede), and is currently constructing Pump Station 2 (Mill Creek) and Pump Station 13 (Zero Street). The City has scheduled design and construction of improvements to Pump Station 5 (Walnut) and Pump Station 6 (Riverfront) as listed in Appendix E2 of this Consent Decree.

In addition, the City replaced Pump Station 19 (Candlestick) in 2001 and completed replacement of the Force Main serving Pump Station 19 in 2014. The City eliminated Pump Station 7 and Pump Station 14 with the construction of Pump Station 10 (Plum) in 2012. The City is currently designing new Pump Stations to replace Pump Station 15 (Hunter's Point), Pump Station 17 (Edgewater) and Pump Station 23 (104th Street), providing for the elimination of Pump Station 16 (Dallas) by constructing a Gravity Sewer Line to divert the flow to Pump Station 16 to Pump Station 23 (104th Street). The City is currently evaluating the condition of Pump Station 8 (Riverlyn) and has scheduled the design of the replacement for Pump Station 8 in 2015. Pump Station 26 (South Field) and the Gravity Sewer Lines which it serves were constructed in 2004. Pump Station 27 (North Pointe) and the Gravity Sewer Lines it serves were constructed in 2007.

For these fifteen (15) Pump Stations within the WCTS ("Group One"), that have been reconstructed, undergoing major reconstruction, scheduled for construction, or constructed since 2001, the City shall complete an evaluation report and may use information and documentation from engineering reports, contract documents, contract specifications, contract submittals and operations and maintenance manuals and other such existing information for a basis for the Pump Station evaluation and analysis.

For the remaining seven (7) Pump Stations within the WCTS ("Group Two"), the City shall complete an evaluation report to determine what repairs or rehabilitation, if any, or if operational and maintenance changes, if any, may be warranted. The evaluation process will develop information and consider a variety of factors to determine condition, capacity, and/or operating performance. Not all considerations are applicable to each pump station, nor does each consideration apply to each Pump Station in the same manner, since each Pump Station is unique. Thus, the improvements selected for each Pump Station will vary. The evaluation of all twenty-two (22) Pump Stations shall include the following:

a.   Determination of the actual firm capacities of each Pump Station by field measurement;

b.   The adequacy of each Pump Station's firm capacity using the criteria of Paragraph 45 d., i, ii and iii of this Consent Decree; and

c.   The ability of maintenance personnel to take corrective actions within the critical response time calculated for each Pump Station.

### Force Mains

The City conducted an evaluation of the Force Main from Pump Station 2 (Mill Creek) as documented in a Technical Memorandum dated August 2012. The City shall conduct an evaluation of the remaining Force Mains within its WCTS based upon direct inspection of the Force Main where possible, or if direct inspection is not practical, with such assessment deduced from the condition and performance of Force Mains or water mains constructed of similar pipe materials within the immediate proximity of the route of the Force Main. The Force Main evaluation shall, to the extent practicable, include an assessment of the Force Main's normal operating pressure, maximum anticipated pressures which could occur due to pump shut-down or failure, valve failure, together with past maintenance records and visually inspecting the ground surface over the entire length of the Force Main.

The City shall prepare an inventory listing each Force Main in the WCTS indicating the pipe material(s), age or installation date, diameter, length, special corrosion protection measures, if any, and typical flow rates and operating pressures. The inventory shall include any redundant or stand-by Force Main(s) and indicate the capacity of the redundant Force Main as a percentage of the Pump Station's discharge and the typical operating mode (i.e., emergency standby, wet weather standby, or other mode).

### WCTS Pump Station Listing

Project order and completion dates listed in the following WCTS Pump Station Listing, Group One, are estimates only and may change following the time intervals provided by Paragraphs 19, 20, 22 and 24 of the Consent Decree.

| WCTS Pump Station Listing | | | | | | | | WCTS Force Main Listing | |
|---|---|---|---|---|---|---|---|---|---|
| Station Identifier | | Station Age | | | Station Standby Power | | | Force Main Evaluation | |
| Number | Name | Original | Status/Schedule | New (1) | Status | Type | Date (2) | Last | Schedule (3) |
| | Group One | | | | | | | | |
| One | "P" Street | 1966 | Replaced | 2012 | Present | Dual Circuit | 2012 | 2012 | CMOM |
| Two | Mill Creek | 1966 | Construction phase | 2017 | Absent | On-site generator | 2017 | 2012 | CMOM |
| Three | Massard | 1966 | Replaced | 2003 | Absent | Dual Circuit | 2018 | 2003 | CMOM |
| Four | Sunnymede | 1966 | Replaced | 2011 | Present | Dual Circuit | 2011 | 1966 | March 31, 2018 |
| Five | Walnut | 1966 | Replacement scheduled | 2020 | Present | On-site generator | 2013 | 1966 | March 31, 2018 |
| Six | Riverfront | 1966 | Replacement scheduled | 2021 | Present | On-site generator | 2013 | 1966 | March 31, 2018 |
| Eight | Riverlyn | 1968 | Replacement scheduled | 2017 | Present | On-site generator | 2013 | 1990 | March 31, 2018 |
| Ten | Plum | 2012 | Constructed | 2012 | Present | On-site generator | 2012 | 2012 | CMOM |
| Thirteen | Zero Street | 1975 | Construction phase | 2015 | Absent | On-site generator | 2015 | 1975 | March 31, 2018 |
| Fifteen | Hunters Point | 1973 | Final design phase | 2016 | Absent | On-site generator | 2016 | 1973 | March 31, 2018 |
| Sixteen | Dallas | 1973 | To be decommissioned | N/A | N/A | Portable | N/A | N/A | N/A |
| Seventeen | Edgewater | 1973 | Final design phase | 2016 | Absent | On-site generator | 2016 | 1973 | March 31, 2018 |
| Nineteen | Candlestick | 1974 | Replaced | 2001 | Present | On-site generator | 2013 | 2014 | CMOM |
| Twenty-three | 104th Street | 1980 | Final design phase | 2016 | Absent | On-site generator | 2016 | 1980 | March 31, 2018 |
| Twenty-six | South Field | 2004 | Constructed | 2004 | Present | On-site generator | 2013 | 2004 | CMOM |
| Twenty-seven | North Pointe | 2007 | Constructed | 2007 | Present | On-site generator | 2007 | 2007 | CMOM |
| | Group Two | | Evaluation Report | Date (4) | | | | | Evaluation Report |
| Nine | South "I" & 4th | 1969 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1969 | March 31, 2018 |
| Eighteen | Ball Road | 1973 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1973 | March 31, 2018 |
| Twenty | Fort Smith Park | 1975 | March 31, 2018 | 2026 | Present | On-site generator | 1975 | 1968 | March 31, 2018 |
| Twenty-one | Riverbend | 1975 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1975 | March 31, 2018 |
| Twenty-two | Riley Farms | 1998 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1998 | March 31, 2018 |
| Twenty-four | Canterbury | 1979 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1979 | March 31, 2018 |
| Twenty-five | Lakeview Point | 1986 | March 31, 2018 | 2026 | Present | On-site generator | 2013 | 1986 | March 31, 2018 |

**Notes:**

(1) Year indicates time of completed pump station replacement or scheduled completion of replacement.

(2) Year indicates the time standby power was provided or when standby power will be operational.

(3) CMOM indicates assessment to be conducted with continuing maintenance program.

(4) Year indicates time of completion of Group 2 pump station and force main improvements and remedial measures.

**APPENDIX C**
Sewer System Assessment ("SSA") Status
Page 1 of 3

| Basin Number (Total Sewer Footage in Basin) | Sub-basin Number | Total Sub-basin Sewer Footage | Total Number of Manholes in Each Sub-basin | Sub-basin Sewer Footage Previously Assessed | Total Footage of Capacity Improvements Completed or Planned (Appendix E1 & E2) | Sub-basin Footage Remaining to be Assessed |
|---|---|---|---|---|---|---|
| 1 (166,747 ft.) | SM01 | 19,820 | 96 | | | 19,820 |
| | Z006 | 65,757 | 295 | | 7,402 | 58,355 |
| | Z007 | 20,905 | 104 | | | 20,905 |
| | Z008 | 60,265 | 412 | | | 60,265 |
| 2 (145,057 ft.) | Z002 | 24,743 | 94 | | 6,669 | 18,074 |
| | Z003 | 38,821 | 201 | | 2,374 | 36,447 |
| | Z004 | 47,955 | 268 | | | 47,955 |
| | Z005 | 33,538 | 150 | | | 33,538 |
| 3 (111,650 ft.) | CS01 | 38,976 | 195 | | | 38,976 |
| | Z001 | 72,674 | 302 | | 948 | 71,726 |
| 4 (321,197 ft.) | B001 | 7,413 | 32 | | | 7,413 |
| | LF01 | 8,689 | 29 | | | 8,689 |
| | M002* | 48,696 | 151 | | 2,314 | 46,382 |
| | M003 | 124,731 | 528 | | 5,867 | 118,864 |
| | RF01 | 86,995 | 292 | | 9,249 | 77,746 |
| | SK01 | 37,987 | 186 | | 6,115 | 31,872 |
| | WL01 | 6,686 | 24 | | | 6,686 |
| 5 (151,233 ft.) | CC01 | 6,382 | 32 | | | 6,382 |
| | CP01 | 7,204 | 36 | | | 7,204 |
| | CP02 | 4,516 | 23 | | | 4,516 |
| | D001 | 3,712 | 21 | | | 3,712 |
| | HL01 | 3,712 | 18 | | | 3,712 |
| | HP01 | 11,016 | 63 | | | 11,016 |
| | HR01 | 3,556 | 19 | | | 3,556 |

**APPENDIX C**
Sewer System Assessment ("SSA") Status
Page 2 of 3

|  | RB01 | 13,424 | 69 |  |  | 13,424 |
|---|---|---|---|---|---|---|
|  | M001 | 37,690 | 169 | 5,859 | 2,393 | 29,438 |
|  | M002* | 20,553 | 92 |  |  | 20,553 |
|  | M004 | 39,468 | 183 |  | 5,243 | 34,225 |
| 6 (115,985 ft.) | M005 | 34,980 | 176 |  |  | 34,980 |
|  | M006 | 31,223 | 120 |  |  | 31,223 |
|  | M007 | 49,782 | 244 |  | 2,686 | 47,096 |
| 7 (63,180 ft.) | MC07 | 40,579 | 200 |  |  | 40,579 |
|  | MC08 | 22,601 | 77 |  | 3,621 | 18,980 |
| 8 (85,200 ft.) | MC04 | 31,959 | 121 |  | 4,553 | 27,406 |
|  | MC06 | 53,241 | 245 |  | 3,999 | 49,242 |
| 9 (126,775 ft.) | MC03 | 26,834 | 112 |  | 7,566 | 19,268 |
|  | MC05 | 99,941 | 485 | 99,941 |  | 0 |
| 10 (110,880 ft.) | P008* | 44,858 | 229 | 23,595 |  | 21,263 |
|  | P009 | 66,022 | 331 | 16,084 | 5,262 | 44,676 |
| 11 (65,685 ft.) | MC01 | 28,888 | 142 |  | 1,878 | 27,010 |
|  | MC02 | 36,797 | 154 | 36,797 | 1,940 | 0 |
| 12 (120,602 ft.) | P005* | 42,645 | 193 | 41,435 | 5,349 | 1,210 |
|  | P006 | 77,957 | 325 | 77,957 | 4,277 | 0 |
| 13 (142,895 ft.) | P002* | 47,074 | 198 |  | 1,525 | 45,549 |
|  | P010 | 35,312 | 141 |  | 3,224 | 32,088 |
|  | P011 | 55,827 | 278 |  | 1,836 | 53,991 |
|  | P012 | 4,682 | 21 |  |  | 4,682 |
| 14 (138,808 ft.) | P005* | 20,900 | 89 |  | 2,361 | 18,539 |
|  | P007 | 71,837 | 331 |  | 1,247 | 70,590 |
|  | P008* | 46,071 | 207 |  | 3,559 | 42,512 |
| 15 (103,054 ft.) | S006 | 53,008 | 248 |  | 6,857 | 46,151 |
|  | S007 | 50,046 | 245 |  |  | 50,046 |

**APPENDIX C**

Sewer System Assessment ("SSA") Status

Page 3 of 3

| | | | | | | |
|---|---|---|---|---|---|---|
| 16 (46,010 ft.) | S002 | 46,010 | 214 | | 10,621 | 35,389 |
| 17 (102,213 ft.) | RL01 | 60,283 | 308 | 59,962 | | 321 |
| | RL02 | 4,745 | 25 | 4,662 | | 83 |
| | S001 | 37,185 | 149 | 4,093 | | 33,092 |
| 18 (127,159 ft.) | NP01 | 3,561 | 22 | | | 3,561 |
| | P001 | 38,334 | 154 | | 841 | 37,493 |
| | P002* | 7,078 | 25 | | 3,187 | 3,891 |
| | P003 | 36,498 | 134 | | | 36,498 |
| | P004 | 35,253 | 136 | | | 35,253 |
| | P005* | 6,435 | 24 | | | 6,435 |
| 19 (97,268 ft.) | S008 | 54,719 | 237 | | 2,780 | 51,939 |
| | S009 | 42,549 | 179 | | | 42,549 |
| 20 (70,564 ft.) | PL01 | 26,751 | 101 | | | 26,751 |
| | S005 | 36,546 | 172 | | 6,806 | 29,740 |
| | SP01 | 7,267 | 23 | | | 7,267 |
| 21 (166,447 ft.) | CL01 | 2,347 | 12 | | | 2,347 |
| | FL01 | 67,342 | 259 | | 7,369 | 59,973 |
| | FL02 | 50,764 | 195 | | 5,710 | 45,054 |
| | W001 | 45,994 | 188 | | 7,879 | 38,115 |
| 22 (104,560 ft.) | S003 | 62,142 | 292 | 11,917 | 3,659 | 46,566 |
| | S004 | 42,418 | 192 | 11,471 | 2,390 | 28,557 |
| | | | | | | |
| Totals | | 2,683,169 | 12,037 | 393,773 | 161,556 | 2,139,406 |
| | | | | | | |
| * Sub-basins overlapping multiple Basins | | | | | | |

**APPENDIX D**

REMEDIATION DETERMINATION PROCESS

Page 1 of 2



See Page 2

APPENDIX D
## REMEDIATION DETERMINATION PROCESS
Page 2 of 2



**Remedial Measure Alternative Analysis**

City shall determine which solution is most likely to resolve the structural (or capacity-related) defect with the most practical solution and timeframe for eliminating SSO considering both long-term performance of gravity sewer mains/manholes and the life-cycle cost for the gravity sewer mains/manholes. Such Solutions and techniques may include, but are not limited to:

Gravity Sewer Mains:
- Point Repairs: grouting sleeve system, CIPP sleeve and lining, robotic sewer repair, open trench.
- Pipe Rehabilitation: slip lining, CIPP, injection grouting, flood grouting.
- Pipe Replacement: open trench, pipe bursting, jack and bore, directional drilling, micro-tunneling
- Other remedial techniques: new technologies or methods which become available.
- Monitoring or Maintenance Analysis: performed as a part of CMOM.

Manholes:
Manhole Repair or Rehabilitation: poured in place liners, cured in place liners, cementitious coating, polymer coating, mechanical seals and insert replacement, bolt replacement, cover replacement, manhole frame adjustment and resealing.
- Manhole Replacement: other remedial techniques such as new technologies or methods that become available.
- Monitoring or Maintenance Analysis: performed as a part of CMOM.

Prepare Remedial Measures Plan

**APPENDIX E1**
PREVIOUSLY IDENTIFIED CAPACITY-RELATED
REMEDIAL MEASURES PROJECTS ALREADY BUDGETED

| Project Name | Linear Feet of Pipe | Project Completion Date |
|---|---|---|
| Pump Station 19 Force Main Replacement | 7,770 | 2014 |
| Zero Street EQ Basin and Pump Station | N/A | 2015 |
| Mill Creek EQ Basin and Pump Station | N/A | 2016 |
| Mill Creek Capacity Improvements Phase 1 | 8,300 | 2016 |
| Mill Creek Capacity Improvements Phase 2 | 8,0S5 | 2015 |

**APPENDIX E2**
OTHER PREVIOUSLY IDENTIFIED CAPACITY-RELATED
REMEDIAL MEASURES PROJECTS

City anticipates that construction of the projects listed below will be required to achieve the objectives of this Consent Decree, including the goal of eliminating wet weather related SSOs. However, City reserves the ability to re-evaluate the need for these projects based upon completion of hydraulic modeling and capacity assessment requirements of Section V, Article Four of this Consent Decree. Linear feet of pipe listed for each project below represents the current estimate based upon past modeling of the wastewater collection system and may likely change. Project order and completion dates listed are estimates and project priority may change following completion of Section V, Article Four requirements. A final listing will be included within the Capacity Remedial Measures Report as required under Section V, Article 5 of this Consent Decree.

| Project Name | Linear Feet of Pipe | Project Completion Date |
|---|---|---|
| Sub-Basin P007 Capacity Improvements | 1,247 | 2017 |
| Sub-Basin P002 & P003 Capacity Improvements | 7,102 | 2018 |
| Basin 10 and 14 Capacity Improvements Phase I | 8,281 | 2019 |
| Basin W001 Capacity Improvements | 7,879 | 2020 |
| Pump Station 5 Rehabilitation/Replacement | N/A | 2020 |
| Basin FL01 Capacity Improvements | 7,369 | 2021 |
| Basin FL02 Capacity Improvements | 5,710 | 2021 |
| Pump Station 6 Rehabilitation/Replacement | N/A | 2021 |
| Massard WWTP Improvements | N/A | 2021 |
| Basin 10 and 14 Capacity Improvements Phase II | 5,262 | 2022 |
| Phoenix Ave Capacity Improvements | 3,621 | 2022 |
| Skyline Estates Capacity Improvements | 6,115 | 2022 |
| Basin 12 Capacity Improvements Phase I | 6,282 | 2022 |
| Basin 12 Capacity Improvements Phase II | 4,277 | 2023 |
| Sub-Basin P004 Capacity Improvements | 4,561 | 2024 |
| Basin 13 Capacity Improvements | 5,060 | 2024 |
| 4th Street Capacity Improvements | 2,778 | 2025 |
| Sub-Basin M001 Capacity Improvements | 2,393 | 2025 |
| Sub-Basin M004 Capacity Improvements | 5,243 | 2025 |
| Sub-Basin M007 Capacity Improvements | 2,686 | 2026 |
| Sub-Basin M002 and M003 Capacity Improvements | 8,181 | 2026 |

APPENDIX F

## SUPPLEMENTAL ENVIRONMENTAL PROJECT
## PRIVATE SERVICE LINE REPLACEMENT PROGRAM

A.    BACKGROUND

The City's Wastewater Collection and Treatment System ("WCTS") becomes a conduit for storm water when defective Private Service Lines allow rain or groundwater to enter the WCTS. The purpose of the Supplemental Environmental Project ("SEP") is to reduce extraneous flows, including inflow and infiltration ("I&I") caused by defects in private laterals serving residences from entering the WCTS through Private Service Lines. For purposes of this SEP, a defective private lateral is any Private Service Line that connects to the WCTS that discharges any substance that is not intended to be transferred via the WCTS, such as storm water, surface water runoff, and roof runoff. As a result of the Sewer System Assessments ("SSAs") and other work completed pursuant to Section V of the Consent Decree, the City may identify defective Private Service Lines in need of repair or replacement.

B.    DESCRIPTION OF THE SEP

The City may perform the repair or replacement of defective Private Service Lines of eligible residential property owners itself or may use contractors or consultants in implementing this SEP, or may reimburse eligible residential property owners for work performed on defective Private Service Lines in accordance with the SEP program described herein. In implementing this SEP, the City shall do the following, in accordance with the schedule set forth below:

- Draft and submit to EPA a proposed Escrow Agreement for EPA Review and Comment;

- Establish the Escrow and provide a copy of the Escrow Agreement to EPA;

- Fund the Escrow;

- Develop eligibility qualifications to identify residential property owners eligible for this SEP, using 2010 census information to identify moderate, low, and very low income level eligibility. In the event that more eligible residents apply for the SEP than there are funds available, preference shall be given to eligible very low

1

income residents, then eligible low income residents, and then eligible moderate income residents. If after four (4) years from the Date of Lodging, the City has spent less than twenty-five percent (25%) of the Escrow Funds, it may submit to EPA for Review and Approval a proposal to establish additional criteria for eligibility for the SEP;

- Provide information to residential property owners advising them of the potential availability of the SEP, the eligibility requirements, and contact information if they are interested in participating;

- Review and process applications from residents;

- Establish standards for directing the employees or contractors/plumbers performing the repair or replacement of a Private Service Lines under this SEP, including standards to ensure appropriate permits for the work are secured;

- Establish standards for reimbursing an eligible residential property owner who has paid a qualified plumber/contractor  and for paying directly a qualified plumber/contractor for work performed in accordance with this SEP;

- Maintain records of: deposits into the SEP Escrow, work performed on Private Service Lines by City employees and qualified contractors/plumbers, and payments made from the Escrow;

- Complete and submit reports to EPA as required by the Consent Decree; and,

- Ensure that the SEP is completed in accordance with the schedule set forth below.

C.    SEP COSTS

The City shall spend at least $400,000 of eligible SEP costs for the repair and/or replacement of Private Service Lines for eligible residential property owners.  Eligible SEP costs are only the costs of performing repair or replacement work, by either City employees or private contractors/plumbers on Private Service Lines owned by private residential customers.  If the City utilizes its own employees and equipment to perform the repair and/or replacement of Private Service Lines, the City shall only be given credit against the total funding obligation if the activity is not something that otherwise would have been performed by the City's employees, and if any such work is supported by time and expense records, which are subject to review by EPA.  The amount incurred by the City in using its own employees and equipment, including associated administrative and incidental costs, to perform the SEP may be disbursed to the City from the Escrow per the terms of the Escrow agreement.

The average cost of the services on each private residential property is estimated to range from $1,500 to $2,500 for repair or replacement of a defective Private Service Lines. Actual costs will depend on length of Private Service Lines, surface and sub-surface interferences to the Private Service Line, and other relevant factors.

D.    SEP IMPLEMENTATION

1.    Payments into the SEP Escrow

Within one (1) Year of the Date of Lodging of the Consent Decree, the City shall deposit two hundred thousand dollars ($200,000), which is fifty (50) percent of the total SEP value, to an interest-bearing escrow account ("Escrow") to be used for performance of the SEP, in accordance with the schedule below, and subject to any credit for eligible SEP costs of City employees or equipment under Paragraph C above.

The City shall allow the United States to review the proposed Escrow Agreement prior to depositing any funds in the SEP Escrow. The City shall provide a copy of the executed Escrow Agreement within thirty (30) Days of the City's initial deposit to the Escrow. The City shall provide EPA with documentation of the deposits to the Escrow within thirty (30) Days of each such deposit. Any interest earned on the Escrow funds may be used by the City to offset the amount of the additional deposits specified herein. The City shall make deposits to the Escrow according to the following schedule:

| Year | Amount |
|------|--------|
| Within one (1) year of the Date of Lodging | $200,000 |
| Within six (6) years of the Date of Lodging | $100,000 |
| Within eight (8) years of the Date of Lodging | $100,000 |

2.    Project Implementation

Within one (1) Year after the Date of Lodging, the City shall:

3

- Develop a list of qualified plumbers/contractors who can perform the services at agreed-upon costs for standard scopes of work and in accordance with current plumbing code requirements.  Eligible private property owners who want to hire a plumber/contractor to repair or replace their defective Private Service Lines must select from the list of qualified plumbers in order for the work to be paid for from the SEP Escrow account;

- Develop scopes of work, fee schedule, forms, and contracts to be used in implementation of the SEP;

- Develop a process to notify residential property owners of the program.  In addition to general notifications, the City may include in its process direct notification to individual residential property owners when the City discovers a Private Service Line in need of repair or replacement throughout the term of the Consent Decree;

- Develop financial hardship qualifications for eligibility for the SEP;

- Determine which residential property owner applicants are eligible to participate in the SEP and notify those residents; and,

- Develop a system to maintain records of disbursement of funds from the Escrow and records of location data of residential property owners that have had services performed on their property as part of the SEP program.

Between one (1) Year from the Date of Lodging and the completion of the SEP, the City shall:

- Begin implementing the SEP;

- Track work performed pursuant to the SEP and maintain records of all work performed whether by the City itself, or by qualified plumbers/contractors hired by eligible property owners, including, at a minimum, the names and addresses of all residential property owners receiving services; and,

- Track all deposits to the SEP Escrow, and all amounts disbursed from the SEP Escrow : 1) to the City itself, when the City has performed the repair or replacement work, at the request of the eligible private property owner; 2) to qualified plumbers/contractors who directly seek payment from the Escrow for repair or replacement work performed for eligible private property owners; and (3) to reimburse eligible private property owners who have paid qualified plumbers/contractors for repair or replacement work on their defective Private Service Lines;

4

The City shall use best efforts to ensure that the SEP is performed expeditiously and that at least 50% ($200,000) of the SEP funds are issued to or expended on behalf of eligible participants within six (6) Years of the Effective Date of the Consent Decree.

3.      Reporting Schedule

In its Annual Report required pursuant to Section IX (Reporting) of the Consent Decree, the City shall include the following information regarding the SEP implementation:

- Deposit of funds to the Escrow by the City;

- Disbursement of funds from the Escrow by the Escrow Agent and to whom disbursements are made to pay plumbers/contractors, or eligible property owners or to the City for services completed;

- The current balance of funds held in the Escrow;

- List of locations (addresses) of residential property owners where services have been performed under the SEP program; and,

- Description of other tasks required performed to implement the SEP during the year.

4.      Final Completion Report

Within ninety (90) of the completion of the SEP, which shall be no later than eleven (11) Years after the Date of Lodging of the Consent Decree, the City shall submit a Final Completion Report to EPA as provided in Paragraph 74 of the Consent Decree.

## APPENDIX G
**Fort Smith Consent Decree Deliverables and Associated Work Requirements**

| Name of Deliverable | First Reference in Consent Decree | Due Date for Deliverable (and for Associated Work) | Whether Deliverable Subject to EPA Review and Approval ("R&A"), or EPA Review and Comment ("R&C") | Whether Deliverable Must be Certified under Section XI or XVII |
|---|---|---|---|---|
| SSA Condition Assessment Reports | Section V, Article One, Paragraph16 | Due March 31st of the following Year for SSA work done in the preceding Calendar Year | R&C | Section XVII |
| Plan for Additional Remedial Measures to be constructed in Basin 12 | Section V, Article Two, Paragraph 17 | With or before the first Annual Report due March 31, 2016. | R&A | Section XVII |
| Remedial Measures Plans resulting from SSA activities conducted in each Calendar Year- | Section V, Article Two, Paragraph 18 | Due March 31st of the second Calendar Year following the Calendar Year in which the SSA activities are performed (*i.e.* The Remedial Measures Plan for WCTS defects identified by SSA activities performed in Calendar Year 2015 is due 3/31/17, etc.).<br><br>(Remedial Measures shall be completed no later than December 31st of the fourth | R&A | The Remedial Measures Plan resulting from SSA activities conducted in the first Calendar Year following the Date of Lodging- Section XI;<br><br>All other Remedial Measures Plans for later Calendar Years- Section XVII |

1

| | | year following the Calendar Year in which the SSA activities were performed (*i.e.* Remedial Measures identified as a result of SSA conducted in Calendar Year 2015 shall be complete by 12/31/19)) | | |
|---|---|---|---|---|
| Documentation Confirming Completion of Installation of Alternative Power Supply at All Pump Station | Section V, Article Three, Paragraph 21 | Documentation: With or before the Annual Report due March 31, 2019.  <br><br>Installation:  Completed by 12/31/18) | R&C | Section XVII |
| Pump Station and Force Main (PS/FM) Report  <br><br><br><br>Improvements and Remedial Measures Identified in the PS/FM  Report | Section V, Article Three, Paragraph 22  <br><br><br><br>Section V, Article Three, Paragraph 23 and **Appendix B** | With or before the Annual Report due March 31, 2018.  <br><br><br>Remedial Measures for **Group 1** Pump Stations listed in **Appendix B** shall be complete by 12/31/21; and Remedial Measures for **Group 2** Pump stations listed in **Appendix B** shall be completed no later than | Evaluation component of PS/FM Report- R&C  <br><br>Improvements/ Remedial Measures component of PS/FM Report- R&A | Evaluation component- Section XVII  <br><br>Improvements/Remedial Measures component- Section XI |

2

| | | 12 years from Date of Lodging). | | |
|---|---|---|---|---|
| Hydraulic Model Update Report | Section V, Article Four, Paragraph 27 | With or before the Annual Report due March 31, 2017. | R&C | Section XVII |
| Capacity Assessment Report | Section V, Article Four, Paragraph 31 | With or before the Annual Report due March 31, 2018 | R&C | Section XI |
| Capacity Remedial Measures Plan | Section V, Article Five, Paragraph 32<br><br>Article Six | With or before the Annual Report due March 31, 2019<br><br>(The Capacity Remedial Measures projects listed in **Appendix E1** shall be completed in accordance with the dates specified therein. The Capacity Remedial Measures listed in **Appendix E2** shall be completed in accordance with the dates listed therein, as may be updated in the Hydraulic Remedial Measures Plan. All other Capacity Remedial Measures identified in this Plan shall be completed no later than 12 years from the Date of Lodging). | R&A | Section XVII |

3

| Capacity, Management Operation and Maintenance ("CMOM") Program-FOG Control Program Component | Section V, Article Seven, Paragraph 37 | 24 months from Date of Lodging | R&A | Section XVII |
|---|---|---|---|---|
| CMOM Program – Root Control Program Component | Section V, Article Seven, Paragraph 39 | 12 Months from the Date of Lodging | R&A | Section XVII |
| CMOM Program – Gravity Sewer Line Cleaning Component | Section V, Article Seven, Paragraph 41 | 12 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program-Continuing Sewer System Assessment Program ("CSSA") Component | Section V, Article Seven, Paragraphs 43-44 | 24 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program-Continuing Pump Station and Force Main Evaluation and Maintenance Program Component | Section V, Article Seven, Paragraph 45 | 24 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program-Continuing Capacity Assurance ("CCA") Program Component | Section V, Article Seven, Paragraph 46 | 24 Months from Date of Lodging | R&A | Section XVII |

4

| CMOM Program-SSO Reporting Component | Section V, Article Seven, Paragraph 47 | 12 Months from Date of Lodging | R&A | Section XVII |
|---|---|---|---|---|
| CMOM Program – SSO Emergency Response Program Component (a/k/a the "Sanitary Sewer Overflow Emergency Response Program" or "OERP") | Section V, Article Seven, Paragraph 48 | 12 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program-Information Management System Modification Plan | Section V, Article Seven, Paragraphs 50-52 | 24 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program – Standard Operating Procedures (SOP) Component Plan and Schedule | Section V, Article Seven, Paragraph 53 | 18 Months from Date of Lodging. | R&A | Section XVII |
| CMOM Program-Private Service Line Defect Remediation Program Component | Section V, Article Seven, Paragraph 54 | 24 Months from Date of Lodging | R&A | Section XVII |
| CMOM Program – Comprehensive Training Program Component | Section V, Article Seven, Paragraph 55 | 18 Months from Date of Lodging | R&A | Section XVII |
|  |  |  |  |  |

5

| Mitigation Program Quality Assurance Project Plan ("QAPP") | Section VI, Paragraph 70 | 12 Months from Date of Lodging | R&C | Section XVII |
|---|---|---|---|---|
| Supplemental Environmental Project ("SEP")- Escrow Agreement | Appendix F, Subsection B, first bullet | Six (6) Months from the Date of Lodging | R&C | Section XVII |
| SEP- Copy of Executed Escrow Agreement | Appendix F, Subsection D | Within thirty (30) Days of making the initial deposit of $200,000 (which is due within one (1) Year of the Date of Lodging) | (no review, only receipt) | Section XVII |
| SEP- Documentation of Deposits to Escrow Account | Appendix F, Subsection D | Within thirty (30) Days of making each of the three deposits required in Appendix F, Subsection D | (no review, only receipt) | Section XVII |
| SEP Final Completion Report | Section VIII, Paragraph 74 and Appendix F, Subsection D.3 | Within Ninety (90) Days of the completion of the SEP, but no later than eleven (11) Years after the Date of Lodging | R&A | Section XVII |
| First Annual Report | Section X, Paragraphs 90-96 | 3/31/16 | Certain aspects- R&A ; other aspects- R&C (See Paragraphs 80-81 of Consent Decree) | Section XI |

| Subsequent Annual Reports | Section X, Paragraphs 90- 96 | Due March 31st of the Year following the Calendar Year in question | Certain aspects- R&A ; other aspects- R&C (See Paragraphs 80-81 of Consent Decree) | Section XVII |
|---|---|---|---|---|